UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                      :

AMERICAN SOCIETY FOR THE
PREVENTION OF CRUELTY TO ANIMALS,  :

             Plaintiff,       :

             v.         :     Civil Action No. 1:19-cv-3112-NRB

THE ANIMAL AND PLANT HEALTH
INSPECTION SERVICE, and
THE UNITED STATES DEPARTMENT
OF AGRICULTURE,

            Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS
AND FOR SUMMARY JUDGMENT, AND IN SUPPORT OF PLAINTIFF'S
CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page**

I.  THE ANIMAL WELFARE ACT ................................................................... 2

II. THE FREEDOM OF INFORMATION ACT................................................. 3

III. PROCEDURAL HISTORY........................................................................ 4

I.  JUDGMENT ON THE PLEADINGS IS INAPPROPRIATE WITH RESPECT
    TO THE ASPCA'S POLICY OR PRACTICE CLAIM.................................... 6

    A.  Legal Standards for Rule 12(c) Motion for Judgment on the Pleadings................ 9

    B.  Defendants' Brief Only Addresses One Component of the ASPCA's
        Policy or Practice Claim. ............................................................... 10

    C.  The ASPCA Alleged Facts That Support a Policy or Practice Claim. ................ 11

II. SUMMARY JUDGMENT SHOULD BE GRANTED TO THE ASPCA ON ITS
    POLICY OR PRACTICE CLAIM. .......................................................... 16

    A.  The ASPCA is Entitled to Summary Judgment on its Policy or Practice
        Claim............................................................................................ 16

        1.  The Agencies have a practice of failing to issue timely
            determinations in violation of FOIA........................................ 17

        2.  The Agencies have a practice of failing to respond to requests
            "promptly" in violation of FOIA. ........................................... 18

        3.  The Agencies have adopted a policy of withholding non-exempt
            information in violation of FOIA............................................. 20

        4.  The Agencies have applied their unlawful policy in a
            discriminatory manner. ........................................................ 21

    B.  The Agencies' Alternative Motion for Summary Judgment on the
        ASPCA's Policy or Practice Claim Should be Denied........................ 24

        1.  The Agencies' submissions in support of their alternative summary
            judgment motion fail to establish the Agencies have acted with due
            diligence or explain how they plan to conform to FOIA's mandate
            to make non-exempt records promptly available.................... 24

        2.  Woods' "first in, first out" characterization is not consistent with
            the record evidence. ........................................................... 25

        3.  The causes Woods cites for the backlog are attributable to the
            Agencies' own unlawful and ill-considered decisions.............. 26

        4.  The Agencies have not shown due diligence in addressing the
            backlog they created. ........................................................... 28

        5.  Woods fails to reference USDA's actual backlog reduction plan. .......... 28

**TABLE OF CONTENTS**

(continued)

**Page**

6.    The Agencies fail to describe how they intend to conform with FOIA's mandate going forward. .............................................................. 30

III.    THE AGENCIES UNLAWFULLY WITHHELD CERTAIN INFORMATION AND RECORDS PURSUANT TO FOIA EXEMPTIONS 4 AND 5 ............................ 31

A.    The Information Redacted on the Basis of Exemption 4 is Not "Confidential." ...................................................................................... 32

B.    Defendants Must Disclose Certain Information Withheld Under Exemption 5. ........................................................................................ 38

1.    Defendants' declaration and Exemption 5 *Vaughn* Index are generally insufficient. ............................................................. 40

2.    Certain Ruby Fur Farm documents do not fall within Exemption 5 ........ 42

a.    The July 25, 2017 "Ruby Fur Farm update" e-mail ..................... 43

b.    The July 26, 2017 "RFF" e-mail .................................................. 46

c.    The July 27, 2017 "FW: Urgent: Unlawful USDA Confiscation in Iowa Underway" e-mail. ................................... 48

d.    The "Ruby Memo, 072517" ......................................................... 49

e.    "Ruby Confiscation, Welch". ...................................................... 51

3.    Defendants failed to demonstrate that disclosing the withheld material would harm interests protected by Exemption 5. ..................... 52

4.    Defendants must disclose all reasonably segregable information. .......... 53

Plaintiff, the American Society for the Prevention of Cruelty to Animals ("ASPCA"), through undersigned counsel, pursuant to Rule 56, respectfully submits this Memorandum of Law in Opposition to Defendants' the Animal and Plant Health Inspection Service ("APHIS") and the United States Department of Agriculture ("USDA") (together, "Defendants" or the "Agencies") Motion for Summary Judgment on Plaintiff's FOIA Requests and for Judgment on the Pleadings, or in the Alternative, Summary Judgment, Regarding Plaintiff's Pattern or Practice Claim ("Defendants' Motion"), and Cross-Motion for Summary Judgment ("Plaintiff's Cross-Motion").

## INTRODUCTION

FOIA's primary objective is disclosure, not secrecy.  In February 2017, Defendants embarked on a fool's errand that reversed these objectives and succeeded only in wrecking APHIS' FOIA process.  In order to prevent the public from being able to link a specific USDA-licensed dealer with conduct that violated the Animal Welfare Act, the Agencies blacked-out their online database – containing their most frequently requested records – and began redacting inspection and enforcement records to conceal information they had released for decades.

The result was both inevitable and entirely foreseeable.  FOIA requests to APHIS rose sharply, the Agencies faced multiple lawsuits challenging the removal of the database and their new redaction policy, and Congress called for the database's restoration.  But rather than ramp up efforts to meet the predictable increase in FOIA requests, APHIS processed hundreds fewer requests in 2017 than it had the year before.  Its FOIA backlog ballooned and, with it, response times stretched into years.

Three years later, the D.C. District Court has rejected the Agencies' flimsy attempt to justify hiding the identity of violators, and Congress has ordered the Agencies to fully restore the online database with unredacted records.  The wreckage of the Agencies' reckless decisions,

namely, a backlog of over 1,000 requests and extensive response times, remains.  Despite the fact that, by its own admission, APHIS failed to respond timely to the ASPCA's FOIA requests 95% of the time, and failed to respond at all to numerous requests even after this litigation commenced, the Agencies inexplicably deny they have a practice of failing to promptly respond.  Worse yet, they have identified no plan to conform their practice to FOIA's requirements.  The ASPCA's lawsuit asks this Court to require the Agencies to do what they refuse to do – follow the law.

## BACKGROUND

## I.    THE ANIMAL WELFARE ACT

The USDA, through APHIS, administers the Animal Welfare Act ("AWA"), and its implementing regulations, 9 C.F.R. §§ 1.1, *et seq*.  The AWA authorizes Defendants to issue licenses to animal "dealers" and "exhibitors," as defined therein, once "the dealer or exhibitor shall have demonstrated that his facilities comply with the standards promulgated by the Secretary[.]" 7 U.S.C. § 2133.  Such standards "govern the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors." *Id*. § 2143(a)(1).  Dealers and exhibitors are prohibited from engaging in regulated activities without a valid license from Defendants.  *Id*. § 2134.

Defendants are charged with "mak[ing] such investigations or inspections" as "necessary to determine whether any [*inter alia*] dealer, exhibitor, [or] research facility … has violated or is violating any provision of this chapter or any regulation or standard issued thereunder, and for such purposes, the [Defendants] shall, at all reasonable times, have access to the places of business and the facilities, animals, and those records required to be kept …." *Id*. § 2146(a).  Thus, regulated entities and persons under the AWA are subject to inspection by Defendants, including prior to

receiving a license and unannounced compliance inspections.  9 C.F.R. § 2.3.[1]  Defendants'
administration of the AWA has been the subject of much consternation, including by the USDA's
own Office of the Inspector General ("OIG").  The OIG has issued a number of reports finding
Defendants' activities woefully deficient.[2]  This precedent underscores the need for continued
public scrutiny of the Defendants' administration and enforcement of the AWA.

## II.    THE FREEDOM OF INFORMATION ACT

Enacted in 1966, the same year as the AWA, the "basic purpose of FOIA is to ensure an
informed citizenry, vital to the functioning of a democratic society, needed to check against
corruption and to hold the governors accountable to the governed."  *NLRB v. Robbins Tire &
Rubber Co.*, 437 U.S. 214, 242 (1978).  It is "a means for citizens to know 'what their Government
is up to.'"  *NARA v. Favish*, 541 U.S. 157, 171-72 (2004) (citation omitted); *U.S. Dep't of Justice
v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989) (quoting S. Rep. No. 89-
813, at 3 (1965)).  "This phrase should not be dismissed as a convenient formalism.  It defines a
structural necessity in a real democracy."  *NARA*, 541 U.S. at 171-72.  Pursuant to the FOIA, an
agency "shall make [] records promptly available to any person" upon request, unless the records
fall within nine categories of statutorily exempt material.  5 U.S.C. § 552(a)(3)(A).  The USDA
and APHIS are both "agencies" subject to the FOIA.  *Id.* §§ 551(1), 552(f)(1).

FOIA exempts specific categories of records from disclosure, including, *inter alia*, "trade
secrets and commercial or financial information obtained from a person and privileged or

---

[1] *See also* Hensley Decl., Ex. 27.

[2] *See, e.g.*, Hensley Decl. ¶ 6; USDA OIG, *APHIS: Animal Welfare Act – Marine Mammals (Cetaceans),* Audit Rpt.
33601-0001-31 (May 2017), *available at* https://www.usda.gov/oig/webdocs/33601-0001-31.pdf; USDA OIG,
*Controls Over APHIS Licensing of Animal Exhibitors*, Audit Rpt. 33601-10-Ch (June 2010), *available at*
http://www.usda.gov/oig/webdocs/33601-10-CH.pdf; USDA OIG, *APHIS Animal Care Program
Inspections of Problematic Dealers*, Audit Rpt. 33002-4-SF (May 2010), *available at*
https://www.usda.gov/oig/webdocs/33002-4-SF.pdf; USDA OIG, *APHIS Animal Care Program
Inspection and Enforcement Activities*, Audit Rpt. 33601-0002-41 (Sept. 2015), *available at*
https://www.usda.gov/oig/webdocs/33601-0002-41.pdf.

confidential," *id*. § 552(b)(4) ("Exemption 4"), and "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency[.]" *Id*. § 552(b)(5) ("Exemption 5"). Even where an exemption applies, an agency must release "[a]ny reasonably segregable portion of a record" that is otherwise releasable after deleting (*i.e.*, redacting) the portions legally exempt from disclosure. *Id*. § 552(b).

## III.    PROCEDURAL HISTORY

The ASPCA submitted 26 separate FOIA requests to Defendants between February 11, 2016 and January 9, 2019 that are at issue in this case. *See* Dkt. 22 (Amended Complaint (hereinafter "AC")) at ¶ 1; Dkt. 29 (Answer) at ¶ 1. Defendants' failure to respond to the ASPCA's FOIA requests in a timely manner – and in many instances at all – led the ASPCA to file suit on April 8, 2019. *See* Dkt. 1. The ASPCA amended its Complaint on May 31, 2019. *See* Dkt. 22. Defendants answered on August 12, 2019. *See* Dkt. 29.

Subsequently, Defendants undertook several rounds of "reprocessing" the records at issue, through which Defendants have gradually released various categories of previously withheld information. *E.g.*, Dkt. 44, Declaration of Tonya G. Woods ("Woods SJ Decl.") ¶¶ 16, 23-25. The Agencies continue to withhold various information on the basis of FOIA Exemptions 4, 5, 6, 7(A) and 7(C). *Id.*, ¶ 159. The ASPCA *does not* challenge the remaining withholdings pursuant to Exemptions 6, 7(A) and 7(C).

Defendants filed their Motion on April 20, 2020. *See* Dkt. 42 (Motion); Dkt. 43 (Memorandum on Law ("Mem.")); Woods SJ Decl.; Dkt. 45 (Declaration of Tonya G. Woods regarding Plaintiff's Policy and Practice Claim ("Woods PP Decl.")). The ASPCA timely files this opposition and Cross-Motion for Summary Judgment. *See* Order, Dkt. 39. The accompanying Statement of Material Facts ("SMF") describes the undisputed facts material to the ASPCA's

cross-motion, supported by the Declaration of Robert G. Hensley, Jr. ("Hensley Decl.") and accompanying exhibits.

## ARGUMENT

Defendants have persistently failed to adhere to FOIA's requirements, engaging in a practice of delay and adopting an unlawful policy of concealment that has interfered with the ASPCA's right under FOIA to promptly obtain non-exempt records. Specifically, Defendants have a practice of failing to issue timely determinations, a practice of failing to promptly release records, and, in 2017, adopted an unlawful policy and practice of refusing to release non-exempt records to FOIA requestors. Defendants' practices are ongoing, they have offered no assurance that they will not resume their unlawful policy once this litigation has ended, nor have they identified a plan to conform their practices to FOIA in the future. Defendants' policy and practices are unlawful, and the ASPCA has brought this suit seeking declaratory and injunctive relief requiring Defendants to adhere to FOIA's requirements.

As to the ASPCA's policy or practice claim, Defendants have moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), or, in the alternative, for summary judgment under Federal Rule of Civil Procedure 56. The ASPCA likewise moves for summary judgment. Defendants' Rule 12(c) motion should be denied because the Amended Complaint plausibly alleges a pattern of prolonged delay amounting to a persistent failure to abide by FOIA's requirements that interferes with the ASPCA's rights under FOIA. Defendants' motion for summary judgment should also be denied, and the ASPCA's cross-motion should be granted, because the undisputed facts demonstrate that Defendants adopted an unlawful policy and practice of concealment that they applied in a discriminatory and egregious manner, and maintained, and continue to maintain, an unlawful practice of persistent delay. The undisputed facts establish that

Defendants failed to exercise due diligence to address the foreseeable breakdown of APHIS' FOIA process caused by their own adoption of an unlawful policy of concealment.

Additionally, Defendants have unlawfully withheld from the ASPCA certain information and records, alleging that the information is exempt from disclosure under FOIA Exemptions 4 and 5.  Defendants have moved for summary judgment as to these withholdings.  The ASPCA denies that Defendants are entitled to summary judgment and has moved for partial summary judgment with respect to certain withholdings and records.  Specifically, Defendants withholdings under Exemption 4 are improper because the information withheld is not confidential business information – a fact confirmed by *Jurewicz v. USDA*, 741 F.3d 1326 (D.C. Cir. 2014), where Defendants in this action successfully persuaded the D.C. Circuit that the same types of information at issue here were publicly available.  Furthermore, Defendants have failed to meet their burden under Exemption 5 to show that the records at issue are subject to the deliberative process privilege or the attorney-client privilege.  Defendants have further failed to meet their burden to show that they disclosed all reasonably segregable information.  Additionally, the USDA FOIA Director's Declaration, the Exemption 5 *Vaughn* Index, and the evidence in the record strongly indicate that certain records were improperly withheld, and summary judgment should issue in favor of the ASPCA with regard to these records.

The ASPCA is entitled to judgment as a matter of law as stated herein.  Defendants' motions should be denied in full.

## I.      JUDGMENT ON THE PLEADINGS IS INAPPROPRIATE WITH RESPECT TO THE ASPCA'S POLICY OR PRACTICE CLAIM.

The AC alleges that the Agencies adopted, endorsed, or implemented a policy or practice of failing or refusing to release records in response to the ASPCA's FOIA requests and systematically redacting information in violation of the FOIA to prevent the public from being

able to link particular licensees to conduct that violated the AWA.  The AC identifies 35 separate instances of the Agencies' failure or refusal to issue a determination within the 20-day statutory period for response, as well as 26 instances of the Agencies' failure or refusal to respond *at all* to the ASPCA's FOIA requests or appeals after months or years.  AC ¶¶ 50-84, 110-120.  Even when the Agencies did respond, they released only substantially redacted records, erroneously imposing FOIA exemptions that the Agencies themselves had never before applied to similar records until on or about February 2017.  *Id*., ¶ 380.  This new policy of unlawful redaction was carried out in coordination with the Agencies' deliberate removal of online access to their most frequently requested records.  *Id*., ¶¶ 45, 106-07, 135-36, 381.

Between February 11, 2016 and January 9, 2019, the Agencies failed to issue timely determinations in response to numerous FOIA requests submitted by the ASPCA.  *Id*., ¶¶ 50-83.  The vast majority of these requests were virtually identical – seeking inspection records and enforcement actions for USDA-licensed dog breeders during the preceding month.  *Id*., ¶¶ 50-83, 132.  For 26 of these requests, the Agencies did not simply fail to issue a determination within the 20-day statutory response period, they never issued a determination at all.  *Id*., ¶¶ 1, 50-83.  Likewise, the Agencies never requested additional time to respond, never gave any explanation for not responding, and never released any records whatsoever in response to these 26 requests until after the ASPCA filed this action in April 2019.  *See id*., ¶ 45 and *compare* ¶¶ 50-83 of original complaint (Dkt. 1) *with* ¶¶ 50-83 of AC.  *See also*, N. Teleanu letter to Court, Dkt. 25 (Jul. 1, 2019) at p. 1.

While three of the requests at issue here were submitted in 2016, the Agencies' disregard for their obligations under the FOIA became acute in 2017.  In February of that year, without warning, the Agencies blocked the public from viewing APHIS' ACIS database ("Database"),

which had previously provided access to inspection reports of USDA-licensed facilities. AC ¶ 41. In place of this online Database, the Agencies directed the public to "submit Freedom of Information Act (FOIA) requests for that information." *Id.*, ¶ 46. As a result, the ASPCA and the public were now forced to wait months, or even years, or – as illustrated by the matter before this Court – forced to file a lawsuit to access records that were previously available almost instantaneously. *Id.*, ¶¶ 47-49.

At the time the Agencies began making these records available online in 2009, the then-Deputy Administrator for Animal Care stated that these reports "have been the most frequently requested document from APHIS with approximately 850 requests fulfilled each year." *Id.*, ¶ 37. A year later, the Agencies reported that the Database had reduced FOIA requests by 35%. *Id.* As a predictable consequence, the Agencies' decision to block access to these records resulted in a precipitous increase in FOIA requests. *Id.*, ¶ 47.

As evidenced by the backlog of requests that quickly accrued, the Agencies failed to take adequate measures[3] to address the entirely foreseeable result of its decision to deprive the public of online access to these records. Within months, Congress had signaled its disapproval of the Agencies' unilateral decision, and directed that the Agencies:

> restore all legally permissible records previously removed, and resume posting on the USDA website. The online searchable database should allow analysis and comparison of data and include all inspection reports, annual reports, and other documents related to enforcement of the HPA and the AWA.

H. Rept. 115-232 to H.R. 3268 (Jul. 17, 2017). The Agencies failed to comply fully with Congress' directive and repopulated the Database with heavily-redacted copies of only some of the records that had previously been available online. AC ¶ 45. These redactions concealed information that

---

[3] The government's brief reveals that, after removing the Database and directing the public to file FOIA requests, *the Agencies processed over 200 fewer requests in 2017* than they did the year before. Mem. at 45.

would allow the public to link a licensee to a particular inspection or otherwise concealed the status of a licensee's compliance with the AWA.  *Id*.  On the rare occasion that the Agencies released records to the ASPCA during this period, they concealed the same types of information under the guise of Exemptions 6 and 7(c).  AC ¶¶ 356, 364.

Previously, in 2018, the ASPCA had been forced to file suit against the Agencies after they began redacting this licensee information and refused to respond to four timely administrative appeals challenging the Agencies' changed practice.  *See* Case No. 1:18-cv-04559 (S.D.N.Y.). While that lawsuit was pending, the Agencies continued to ignore subsequent ASPCA appeals, even in the face of a request to the Agencies' counsel of record for assistance.  *See* AC ¶¶ 109- 122.  Thus, the ASPCA was forced to file this second lawsuit in 2019 to obtain responses to the additional administrative appeals the Agencies inexplicably continued to ignore, as well as to seek release of records responsive to the 26 FOIA requests that the Agencies refused to fulfill.  *Id*.

In sum, the AC identifies *over 60 separate instances* in which the Agencies violated their obligations under the FOIA to respond to the ASPCA's requests or appeals.  *Id*., ¶¶ 50-84, 110- 120.  Even when the Agencies did respond, they did so in accordance with their post-2017 policy or practice of imposing substantial redactions designed to prevent the public from connecting specific licensees with AWA violations.  As the AC states, the harm caused by the Agencies' actions is ongoing, as the ASPCA will continue to submit requests for the same or similar records, and the Agencies have continued to impose unlawful redactions and have refused to timely release, or release at all, inspection and enforcement records in response to the ASPCA's subsequent FOIA requests.  *Id*., ¶¶ 123-136.  These allegations are sufficient to state a policy or practice claim.

### A.    Legal Standards for Rule 12(c) Motion for Judgment on the Pleadings.

"After the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings."  Rule 12(c).  A motion for judgment on the pleadings uses the

same standard applicable to Rule 12(b)(6) motions to dismiss: the Court accepts all allegations in the complaint as true and makes all inferences in the non-moving party's (here, the ASPCA's) favor. *Kirkendall v. Halliburton, Inc.*, 707 F.3d 173, 178 (2d Cir. 2013). A Rule 12(c) motion should be denied where the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hassell v. Fischer*, 96 F. Supp. 3d 370, 378 (S.D.N.Y. 2015), *aff'd,* 879 F.3d 41 (2d Cir. 2018) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 663 (2009)).

To state a policy or practice claim, a plaintiff must allege "(1) some policy or practice that (2) results in a repeated violation of FOIA." *Am. Ctr. for Law & Justice v. Dep't of State*, 254 F. Supp. 3d 221, 224 (D.D.C. 2017). Said differently, a complaint must plausibly allege "that the agency has adopted, endorsed, or implemented some policy or practice that constitutes an ongoing 'failure to abide by the terms of the FOIA.'" *Muttitt v. Dep't of State*, 926 F. Supp. 2d 284, 293 (D.D.C. 2013) (quoting *Payne Enters., Inc. v. United States*, 837 F.2d 486, 491 (D.C. Cir. 1988)). That FOIA policy or practice may be "informal, rather than articulated in regulations or an official statement of policy." *Payne*, 837 F.2d at 491.

### B. Defendants' Brief Only Addresses One Component of the ASPCA's Policy or Practice Claim.

Tellingly, Defendants' brief ignores two-thirds of the allegations supporting the ASPCA's policy or practice claim, and instead mischaracterizes it as "center[ing] exclusively on Defendants' alleged[4] failure to make a determination on ASPCA's requests within 20 days." Mem. at 39; *see also id*. at 41 ("ASPCA's allegations of repeated delay, <u>without anything more</u>, are insufficient to state a claim of an actionable illegal FOIA policy or practice.") (emphasis added). The Agencies fail to address the fact that the ASPCA's claim is also premised upon Defendants' policy or

---

[4] While the government describes these failures as "alleged", Defendants admit in their Answer that they failed to issue timely determinations for the requests at issue in this lawsuit. *See, e.g.,* Answer ¶¶ 142, 150, 160, 172, 181, 190, 199, 208, 228, 235, 237, 246, 253.

practice of refusing to release records at all or of "releas[ing] only substantially redacted records, citing FOIA Exemptions that do not apply and which Defendants themselves did not apply to similar records until on or about February 2017." AC ¶ 380. Rather than mere delay, it is "Defendants' erroneous redactions <u>combined</u> with their unreasonable, inexcusable and unexplained delays [that] have blocked the ASPCA's access to vital information contained in the requested records." *Id.* (emphasis added).

### C.    The ASPCA Alleged Facts That Support a Policy or Practice Claim.

Regardless of whether the straw man constructed by Defendants would survive a motion for judgment on the pleadings, the actual allegations of the AC state a claim to relief that is plausible on its face. As the D.C. Court of Appeals has stated, "it is settled law that informal agency conduct resulting in long delays in making requested non-exempt records available may serve as the basis for a policy or practice claim." *Judicial Watch v. DHS*, 895 F.3d 770, 777-78 (D.C. Cir. 2018). In *Judicial Watch*, the plaintiff alleged that the Secret Service "regularly fails to issue determinations in response to [its] travel-related FOIA requests within the time period required by FOIA, causing [it] to bring suit in order to obtain the requested records." *Id*. at 779 (citation omitted). The plaintiff's complaint "posits that the Secret Service has an informal practice, harmful to Judicial Watch's mission and work, of repeatedly withholding 'nearly identical' records, without explanation, for unreasonable periods of time." *Id*. The Secret Service moved to dismiss the plaintiff's policy or practice claim pursuant to Rule 12(c), taking the position that FOIA already provided a remedy when an agency failed to respond within the statutory period – "the requesting party may file a lawsuit without exhausting the administrative remedy." *Id*.

The appellate court denied the Secret Service's Rule 12(c) motion, and bluntly rejected this interpretation as "untenable for any number of reasons."

> Most significantly, the basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption, and to hold the governor accountable to the governed.  Non-exempt records are to be made promptly available for little more than the payment of copying costs.  The Secret Service's interpretation renders FOIA's mandate of prompt response superfluous, i.e., a dead letter.

*Id*. at 780 (internal quotations and citations omitted).  Remarkably, Defendants' brief adopts not the D.C. Circuit's interpretation, but rather the Secret Service's rejected view of FOIA, asserting that, while FOIA "contemplates" that agencies will provide a determination within 20 days, "the only 'penalty' for noncompliance with the 20-day timeline 'is that the agency cannot rely on the administrative exhaustion requirement to keep cases from getting to court.'"  Mem. at 39 (citation omitted).  Thus, after mischaracterizing the ASPCA's claim as one "centered exclusively" on the Agencies' failures to issue timely determinations, Defendants advance an argument against their own mischaracterization that *Judicial Watch* rejected as "untenable".

The allegations of the AC closely track those of the plaintiff in *Judicial Watch*.  As in that case, the ASPCA has for years regularly submitted requests mostly for nearly identical records – records of inspections and enforcement actions – and the Agencies have regularly failed to issue determinations in the time period allowed by FOIA.  AC ¶¶ 50-83, 132.  Moreover, the Agencies have a clear practice of withholding requested records for an unreasonable period of time – in some cases for years – without explanation.  *See Judicial Watch*, 895 F.3d at 784, 795 (rejecting the dissent's view that "taking hundreds of days to process requests is a permissible interpretation of an agency's obligations under FOIA").  Beyond these similarities, the AC also alleges that, with regard to the records they do release, the Agencies' adopted a policy or practice in 2017 of unlawfully withholding certain non-exempt information and then refusing to respond to the ASPCA's appeals challenging those withholdings.  AC ¶ 380.  All of these practices have required the ASPCA to file suit, now on two occasions, to obtain requested records and the release of unlawfully withheld non-exempt information.  Together, these allegations present an even stronger

basis for concluding that "an agency has a policy or practice of ignoring FOIA's requirements" than those of the plaintiff in *Judicial Watch*. *See* 895 F.3d at 780.

The Agencies' remaining arguments are similarly without merit. The Agencies again misconstrue the AC, asserting that the ASPCA's own allegations concerning the existence of a backlog of requests provides "a plausible explanation for the alleged delay." Mem. at 40. The AC describes the Agencies' backlog as part of the "broader context [in which] Defendants have failed to fulfill their statutory obligations," not as the sole cause for the Agencies' failure or refusal to abide by FOIA's requirements. AC ¶ 49. The backlog obviously plays no causal role in the Agencies' policy of unlawfully redacting non-exempt information, although the latter may have exacerbated the former. And even if the backlog explains the delay, it does not excuse it. Notably, the government cites no authority for the proposition that a mere backlog of requests excuses an agency from its duties under FOIA, and the case law is to the contrary. To address the "agencies' concerns about the high volume of requests and lack of resources," Congress amended FOIA to provide additional time to respond in unusual circumstances. *Judicial Watch*, 895 F.3d at 781. "[A]s Congress's limited reaction in amending FOIA suggests, staffing shortages and work overload may not render injunctive relief inappropriate." *Id.* at 783.

Moreover, the Agencies provide no reason or authority suggesting that the existence of a backlog is inconsistent with an inference that an agency has a policy or practice of failing to respond to requests in a timely manner. Nor could there be. Every FOIA request that contributes to an agency's backlog is, by definition, a request to which the agency has not responded within the time allowed by the FOIA. As such, the existence of a backlog is entirely consistent with the existence of a policy or practice of withholding records for an unreasonable amount of time. Moreover, if a backlog constituted a defense to a policy or practice claim, this would reward, not

deter, conduct that a policy or practice claim seeks to remedy. The more extreme an agency's policy or practice was, the larger the backlog would become, and so, the stronger the agency's defense.

The Agencies' assertion that the ASPCA cannot "allege that it must resort to litigation to obtain responses to its FOIA requests" also misses the mark. *See* Mem. at 40. First, this argument again ignores the fact that the ASPCA's claim is also premised on the Agencies' policy or practice of unlawfully redacting non-exempt information. The only way that the ASPCA has been able to obtain release of this information is through its two lawsuits against the Agencies. Second, the Agencies' once again adopt the reasoning explicitly rejected by the court in *Judicial Watch*, interpreting FOIA in a way that reads the word "promptly" entirely out of the statute. The fact that the Agencies have responded late, and only to some requests, does not vindicate the ASPCA's right under FOIA to a "prompt" response to requests the Agencies have refused to fulfill for months or years. *See Judicial Watch*, 895 F.3d at 784, 795 (rejecting the dissent's view that "taking hundreds of days to process requests is a permissible interpretation of an agency's obligations under FOIA").

Finally, Defendants argue that the ASPCA fails to articulate how the Agencies' decision to remove the Database and block online public access to its most frequently requested records "was part of a policy or practice to ignore FOIA's requirements." Mem. at 42. The AC directly addresses this: "Defendants acted in bad faith and with the intention of depriving the public of information concerning the Agencies' own activities and those of the licensees that they regulate when they abruptly blocked access to these databases and failed to take adequate measures to respond to the individual FOIA requests that the Agencies specifically directed the public to submit." AC ¶ 49. First, the Agencies obviously knew the information contained on the blocked

Database was subject to FOIA.  Not only had the Agencies described these records as their "most frequently requested," but they actively invited the public to submit FOIA requests for the types of information that had been removed.  Thus, the Agencies willfully deprived the public of access to information about their own operations and the activities of licensed entities and failed to take adequate steps to address the inevitable result of this information blackout.

Furthermore, when the Agencies partially repopulated the Database, they did so with records that were heavily-redacted in ways never seen prior to 2017.  AC ¶¶ 45, 380.  As the AC notes, redacting these previously released documents as the Agencies did was in itself unlawful. AC ¶¶ 1, 45, 122, 130; *see Davis v U.S. Dep't of Justice*, 968 F.2d 1276, 1279-80 (D.C. Cir. 1992) ("[T]he government cannot rely on an otherwise valid exemption claim to justify withholding information that has been officially acknowledged or is in the public domain." (internal quotations and citations omitted)).  Moreover, these redactions were designed "to either conceal information that would link a licensee to a particular inspection or otherwise conceal the status of a license holder's compliance with the AWA."  AC ¶ 45.  While this allegation must be taken as true for the purposes of considering the Agencies' Rule 12(c) motion, it is not speculative.  In *Humane Soc'y of the U.S. ("HSUS") v. APHIS*, 386 F. Supp. 3d 34, 43-44 (D.D.C. 2019) the Agencies expressly argued that the purpose of the redactions they made to inspection reports was to avoid "linking the licensees' names . . . with descriptions of noncompliant conduct. . . ."  The district court rejected this justification and ordered disclosure of the redacted narrative portions of the inspection reports.[5]*Id.*  Thus, the removal of the Database was part and parcel with the Agencies' policy of unlawfully withholding non-exempt information.  Defendants' suggestion that the ASPCA has

---

[5] Furthermore, as the government admits in its brief, following the *HSUS* decision, Defendants reprocessed the records at issue here and released significant amounts of information previously withheld under Exemptions 6 and 7(c).  Mem. at 5-8.

only "gesture[d] at some nebulous policy or practice," (Mem. at 42 (citation omitted)) overlooks these important details and the clear connections that are drawn in the AC.

In sum, the AC alleges all that is required to state a policy or practice claim: "[A] pattern of prolonged delay amounting to a persistent failure to adhere to FOIA's requirements and that the pattern of delay will interfere with its right under FOIA to promptly obtain non-exempt records from the agency in the future." *Judicial Watch*, 895 F.3d at 780. The Agencies' motion for judgment on the pleadings should be denied.

## II. SUMMARY JUDGMENT SHOULD BE GRANTED TO THE ASPCA ON ITS POLICY OR PRACTICE CLAIM.

### A. The ASPCA is Entitled to Summary Judgment on its Policy or Practice Claim.

Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Summary judgment is the usual mechanism for resolving a FOIA dispute." *Brennan Ctr. for Justice at New York Univ. Sch. of Law v. U.S. Dep't of Justice*, 377 F. Supp. 3d 428, 433 (S.D.N.Y. 2019) (quoting *Doyle v. DHS*, 331 F. Supp. 3d 27, 43 (S.D.N.Y. 2018)).The FOIA "adopts as its most basic premise a policy strongly favoring public disclosure of information in the possession of federal agencies." *Halpern v. FBI*, 181 F.3d 279, 286 (2d Cir. 1999). "[D]isclosure, not secrecy, is the dominant objective of the Act." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976). Therefore, "[t]he 'basic purpose reflected a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language. . . .'" *Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 143, 147 (2d Cir. 2010) (quoting *Rose,* 425 U.S. at 360-361). To those ends, "the Act is broadly conceived. It seeks to permit access to official information long shielded unnecessarily from public view and attempts to create a judicially enforceable public right to secure such information

from possibly unwilling official hands." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151–52 (1989) (citation omitted).

The undisputed evidence establishes that the Agencies have persistently failed to adhere to FOIA's requirements, engaging in practice of delay and adopting an unlawful policy of concealment that has interfered with the ASPCA's right under FOIA to promptly obtain non-exempt records. Specifically, the Agencies have a practice of failing to issue timely determinations or promptly releasing records, and, in 2017, adopted an unlawful policy of refusing to release non-exempt records to FOIA requestors. The Agencies' practices are ongoing, and they have offered no assurance that they will not resume their unlawful policy once this litigation has ended nor have they identified a plan to conform their practices to FOIA in the future. For these reasons, as well as those set forth below, Defendants' alternative Motion for Summary Judgment with respect to the ASPCA's policy or practice claim should be denied, and the Court should enter summary judgment in the ASPCA's favor.

### 1. The Agencies have a practice of failing to issue timely determinations in violation of FOIA.

For requests the Agencies classified as "simple," APHIS failed to issue a determination within the 20-day period required by FOIA 87% of the time in FY 2018.[6] In FY 2019, the Agencies improved slightly, but still issued untimely responses to simple requests 83% of the time.[7] The Agencies have fared even worse with the ASPCA's FOIA requests. According to Woods' Declaration, in the 40-month period encompassed by the AC, the Agencies failed to issue timely responses to 72 of 76 requests submitted by the ASPCA. Woods PP Decl. ¶ 32. Thus, it is undisputed that *95% of the time* the Agencies failed to comply with FOIA's mandate that they

---

[6] SMF ¶ 28; Hensley Decl., Ex. 9, at p. 32.

[7] SMF ¶ 29; Hensley Decl., Ex. 19, at p. 25.

"shall … determine within 20 days … after the receipt of any such request whether to comply with such request and shall immediately notify the person making such a request of … such determination and the reasons therefor …."  5 U.S.C. § 552(a)(6)(A)(i).  Furthermore, the Agencies' practice is ongoing.  On May 7, 2020, the ASPCA was forced to inquire regarding the status of twenty-one of its FOIA requests, submitted to the Agencies after this lawsuit was filed, which, as of that date, remained unanswered and overdue.  SMF ¶ 36.

"Practice" is defined by Merriam-Webster's Dictionary as "a repeated or customary action" or "the usual way of doing something."[8]  Which is the Agencies' "practice" – the 5% of the time they respond to the ASPCA in compliance with FOIA, or the 95% of the time they do not?  The question answers itself.  It is the Agencies' practice to fail to issue determinations in compliance with the timeframe in which Congress has said agencies "shall" act.

### 2.    The Agencies have a practice of failing to respond to requests "promptly" in violation of FOIA.

FOIA provides: "Upon any determination by an agency to comply with a request for records, the records shall be made *promptly* available to such person making such request."  5 U.S.C. § 552(a)(6)(C)(i) (emphasis added).  As *Judicial Watch* confirmed, a proper interpretation of FOIA should not render "FOIA's mandate of 'prompt' response superfluous, i.e., a dead letter".  *See Judicial Watch*, 895 F.3d at 780.  Here, the undisputed facts demonstrate that APHIS' responses to the ASPCA's FOIA requests have been anything but prompt.

Woods' Declaration states that APHIS responds to the ASPCA's FOIA requests, on average, in 224 days, a response time even worse than APHIS' average of 200 days for other similar requests.  Woods PP Decl. ¶¶ 32-33.  In FY 2018, 66% of the "simple" requests APHIS

---

[8] *Definition of "practice"*, Merriam-Webster, Inc., *available at* https://www.merriam-webster.com/dictionary/practice (last visited May 16, 2020).

responded to – if it responded at all – took over 100 days to close.[9]  Notably, the Agencies have never claimed that any of the ASPCA's requests at issue here are "complex".  While Woods' Declaration states that one (unspecified) request took 819 days to close, Woods PP Decl. ¶ 32, a close review of her declaration shows that some took even longer.  FOIA Request No. 2016-APHIS-03302-F took 864 days to close, Woods SJ Decl. ¶¶ 26-28, and FOIA Request No. 2017-APHIS-03692-F took 893 days, *id*. at ¶¶ 36-38.  Thus, this is not a case in which an agency is routinely a few days or weeks late in responding, and reasonable minds might differ as to whether the agency is satisfying FOIA's mandate to provide prompt response.  If "promptly" means anything at all, it cannot mean months upon months, and some cases years, of delay.  *See Judicial Watch*, 895 F.3d at 784 (rejecting the dissent's view that "taking hundreds of days to process requests is a permissible interpretation of an agency's obligations under FOIA").

Is it the Agencies' practice – their repeated or customary action, or usual way of doing things – to fail to respond to requests promptly in violation of FOIA?  Yes.  Indisputably.  Moreover, the fact that, after this suit was filed, the Agencies quickly responded to all but one of the 26 FOIA requests and appeals identified in the AC as then outstanding (*see* N. Teleanu letter to Court, Dkt. 25 (Jul. 1, 2019) at p. 1), simply shows they were able to do in three months what they allegedly could not (or refused) to do in the three prior years for FOIA requests dating back to 2016.  This exemplifies the very conduct about which the ASPCA complains – FOIA requests sit with no response, or inadequate or severely delayed responses, and only litigation has prompted the Agencies to act on the requests at issue, while numerous requests submitted *after this suit was filed* are now themselves outstanding and late.

---

[9] Hensley Decl., Ex. 9, at p. 32; SMF ¶ 29.

### 3.    The Agencies have adopted a policy of withholding non-exempt information in violation of FOIA.

In February 2017, APHIS blocked public access to its online Database and began redacting identifying information about licensees in order to anonymize inspection and enforcement records, thus preventing the public from being able to link a specific licensee to activity that violated the AWA.  Memo. in Support of Defendants' Mtn. for Summary Judgment, *HSUS v. APHIS,* 1:18-cv-00646 (TNM), Dkt. 18 (D.D.C., Sept. 7, 2018) ("Def. SJ Br. - *HSUS*") at p. 8; Woods PP Decl. ¶ 13.  The Agencies' stated justification for anonymizing the records and concealing this information was that release "can invite harassment … particularly if the findings document observed noncompliant items or deficiencies under the [AWA] standards and regulations."  Def. SJ Br. - *HSUS* at p. 7.  When a FOIA request was made for records of a specific licensee, the Agencies went so far as to redact the date of inspection in order to prevent the public from being able to match licensees to the redacted inspection reports that the Agencies had reposted to the Database. *Id*., at p. 8; *see also*, Woods Decl. supporting Def. SJ Br. - *HSUS*, Dkt. 18-2 (D.D.C., Sept. 7, 2018), ¶¶ 53, 63.

This policy of concealment was ruled unlawful in *HSUS v. APHIS*.  386 F. Supp. 3d at 45-50.  In that litigation, the Agencies relied on a declaration from Tonya Woods which included two pages of inflammatory, unverified allegations of harassment, allegedly reported by AWA-licensees, to support the Agencies' contention that the risk of harassment required the records to be anonymized.  Woods Supp. Decl. supporting Def. SJ Br. - *HSUS*, Dkt. 22-2 (D.D.C., Dec. 13, 2018), ¶¶ 3-11.  However, as the court recognized, and the government was forced to admit, APHIS never confirmed the truth any of the allegations repeated in this declaration.  Sur-Reply supporting Def. SJ Br. - *HSUS*, Dkt. 27 (D.D.C., Mar. 6, 2019) at p. 5 ("The quotations and summaries of what the licensees expressed are not being submitted for their truth …. Whether these incidents

actually occurred is not relevant ….").  The court disregarded Woods' submission and ordered release of the narrative portions of the records that the Agencies' had withheld: "Without the accounts of harassment from the licensees, the declaration's justification for withholding the information is reduced to speculation and summary accounts of the hearsay.  Nothing in Ms. Woods' declaration suggests that the agency has verified or confirmed any of these reports." *HSUS*, 386 F. Supp. 3d at 45.

Several months after this decision, the Agencies reprocessed the records at issue in this case, releasing substantial amounts of information they had previously withheld.  Thus, it is undisputed that, in February 2017, the Agencies adopted a policy of withholding licensee information.  Likewise, it is undisputed that the Agencies' policy was unlawful.  While the Agencies assert their voluntary release of this information after this litigation commenced moots the ASPCA's claims, that is not the case for a policy or practice claim.  *See Payne*, 837 F.2d at 491-92 (stating that "voluntary cessation" of an unlawful practice will not moot the claim unless the agency can "satisfy[] the heavy burden of demonstrating that there is no reasonable expectation … that the alleged violation will recur" (internal quotations and citation omitted)).  Notably, the Agencies have offered no assurances whatsoever, via affidavit or through their counsel, that they will not resume their unlawful policy once this litigation has concluded.

### 4.   The Agencies have applied their unlawful policy in a discriminatory manner.

In 2018, while the Agencies were unlawfully withholding licensee information from the public, emails confirm that APHIS was releasing the same type of information to a licensee outside the FOIA process.  While "egregious agency action" is not required for a policy or practice claim to succeed, *see Judicial Watch*, 895 F.3d at 781, such conduct is present here.

On June 7, 2018, the ASPCA submitted a FOIA request (2018-APHIS-04457-F) seeking among other things, communications between APHIS personnel and Pinnacle Pet, an AWA-licensee. AC ¶ 73. Over a year later, APHIS released redacted records in response to this request which included an email exchange between APHIS personnel and Pinnacle. Woods SJ Decl. ¶¶ 94-95. However, only after these records were reprocessed (and the redactions removed) did it become clear that, in May 2018, APHIS had released, at Pinnacle's request, dates of inspection for other licensees. *See* Hensley Decl., Ex. 13. Notably, APHIS released this information *the next business day* without requiring Pinnacle to submit a FOIA request.

Two months earlier, on March 21, 2018, HSUS filed suit against APHIS because, as discussed above, the agency refused to release certain information in inspection records, including, specifically, dates of inspection. And two months later, in June 2018, the ASPCA filed suit against APHIS, challenging the Agencies' redaction of, among other things, dates of inspection. Just as Pinnacle had requested information concerning inspection dates for specific licensees, the HSUS litigation involved FOIA requests for inspection records of specific licensees. To defend against HSUS' suit, APHIS relied on a declaration from Tonya Woods arguing that APHIS was justified in redacting dates of inspection "because releasing them would allow the information to be matched to the inspection reports publicly available in the [Database]." Woods Decl. supporting Def. SJ Br. - *HSUS*, Dkt. 18-2 (D.D.C., Sept. 7, 2018), ¶ 53. Release would have permitted HSUS to connect the known licensee to a specific inspection report – thus potentially identifying a licensee as having been cited for violations of the AWA. Def. SJ Br. - *HSUS* at p. 7. As discussed above, the D.C. District Court rejected this argument and ordered disclosure.

Thus, the undisputed evidence shows that while APHIS was rushing to release inspection dates directly to a licensee, APHIS was simultaneously requiring animal welfare organizations and

the public to file FOIA requests, wait months or years to receive a response, and ultimately sue the Agencies to obtain the same type of information.  Although an APHIS official responded on May 22, 2018, stating that she "was just informed" she should not be giving out this information and that Pinnacle would have to file a FOIA request, the whole of the email exchange – the discussion of "stick[ing] to the script" and the question "So no more requests?" – strongly suggests that release of this information had been ongoing.  Hensley Decl., Ex. 13 at Bates No. 001533-34 (emphasis added).  Furthermore, the APHIS official went on to encourage Pinnacle to appeal to the Agencies' "leadership" and Pinnacle indicated it would.  *Id*. at Bates No. 001533.  Without discovery, the ASPCA is unable to determine whether APHIS continued to release this information, with or without a FOIA request, to this licensee or others, or the extent of this practice prior to May 2018. Regardless, the email makes clear that APHIS' direction to stop releasing this information to licensees outside the FOIA process did not issue until *after* APHIS was sued for withholding the same information.  This abuse of the FOIA process – to benefit licensees and to disadvantage animal welfare organizations and the public – is further evidence that Agencies have maintained a policy or practice of violating FOIA and interfering with the right of requestors to receive non-exempt records.

In sum, the undisputed evidence establishes that the Agencies have a practice of failing to issue timely determinations or promptly releasing records – practices which violate FOIA.  These practices are ongoing.  Furthermore, the undisputed evidence establishes that, in 2017, the Agencies adopted an unlawful policy of refusing to release non-exempt records to FOIA requestors and did not direct their personnel to stop releasing similar information directly to licensees outside of the FOIA process until after the Agencies were sued.  Finally, the Agencies have offered no assurance that they will not resume this unlawful policy once this litigation has ended.  For all

these reasons, as well as those set forth below, this Court should enter summary judgment in the ASPCA's favor, declare that the Agencies have adopted, endorsed, or implemented a policy or practice that constitutes an ongoing failure to abide by FOIA's requirements, and enjoin the Agencies from maintaining and continuing their unlawful policy or practice.

**B.    The Agencies' Alternative Motion for Summary Judgment on the ASPCA's Policy or Practice Claim Should be Denied.**

**1.    The Agencies' submissions in support of their alternative summary judgment motion fail to establish the Agencies have acted with due diligence or explain how they plan to conform to FOIA's mandate to make non-exempt records promptly available.**

In support of its motion for summary judgment with respect to the policy or practice claim, the Agencies rely solely on the declaration of Tonya Woods, the director of APHIS' FOIA unit. Mem. at 44-50; *see also* Woods PP Decl.  However, Woods' declaration is replete with conclusory, unsupported and self-serving serving statements, many of which are inconsistent with other undisputed facts in the record.  Woods' Declaration also fails to address material matters, including why the Agencies abandoned the backlog reduction plan outlined in the USDA's 2018 Chief FOIA Officer Report.  Furthermore, Woods' Declaration does not suggest that the Agencies even have a plan that would begin to allow them to conform to FOIA's mandate to make non-exempt records promptly available.  *See Judicial Watch*, 895 F.3d at 784 (stating that, on remand, the agency should "confirm how it intends in the future to conform to FOIA's mandate to make requested non-exempt records 'promptly available'").

While Woods' Declaration focuses mainly on the actions of the FOIA unit she supervises, *the ASPCA has not sued APHIS's FOIA unit*.  The ASPCA's lawsuit names as defendants APHIS and USDA, because the Agencies bear ultimate responsibility for compliance with FOIA.  Woods' FOIA unit did not willfully remove the Database in contravention of Congressional intent – the APHIS Administrator ("Administrator") did.  If insufficient or no resources were reallocated in

February 2017 to meet the increase in FOIA requests that inevitably resulted from the Administrator's decision, that is the fault of APHIS and USDA. The FOIA unit did not itself adopt a policy of imposing unlawful redactions to the records of licensees – APHIS did. Woods PP Decl. ¶ 13 ("*APHIS* removed from its website inspection reports, regulatory correspondence . . . and enforcement records." (emphasis added)). As APHIS' backlog grew following the Administrator's decision, it was not the FOIA unit that abandoned the backlog reduction plan – USDA's Departmental FOIA Office made that decision. Hensley Decl., Ex. 28 at p. 18. And, while the FOIA unit processes requests, the task of initially gathering responsive documents is the responsibility of the Agencies' program offices, *e.g.*, Animal Care. Woods PP Decl. ¶¶ 5-6. To the extent any or all of these agency officials, programs, or components have contributed to a policy or practice that constitutes an ongoing failure to abide by the terms of FOIA, APHIS, USDA, and their leadership are responsible. As such, while the efforts Woods' FOIA unit may take to respond to requests are relevant, those efforts alone are not dispositive of whether the Agencies have acted with due diligence or whether the Agencies have a plan to conform with FOIA's mandate in the future.

## 2. Woods' "first in, first out" characterization is not consistent with the record evidence.

Woods asserts that the FOIA analysts maintain a queue of assigned requests and that requests received by her unit "are generally processed on a first in, first out basis, based upon the particular analyst's receipt of responsive records from the requested office or program." Woods PP Decl. ¶ 6. However, a review of Woods' SJ Decl., ¶¶ 19-158, shows no such pattern for ASPCA requests. For example, 2017-APHIS-03692-F was submitted on November 7, 2016 and not fulfilled until April 19, 2019. Woods SJ Decl. ¶¶ 36-38. The ASPCA submitted a number of requests *after* 2017-APHIS-03692-F which Agencies fulfilled before April 19, 2019, including:

2017-APHIS-06369-F, fulfilled October 5, 2018 (*id.*, ¶¶ 65-67); 2018-APHIS-00902-F, fulfilled December 10, 2018 (*id.*, ¶¶ 83-85); and 2018-APHIS-03222-F, fulfilled August 8, 2018 (*id.*, ¶¶ 140-42).  Woods does not explain these or other out-of-order responses, nor does she support her assertion with documentary evidence.

While Woods states that the analyst's queue is dependent on receipt of records from the relevant program office, her declaration fails to track or disclose when her unit transmitted the request to the program office or how long a program office took to return responsive records.  This is a notable omission because, as discussed *infra*, a key component of the USDA's original backlog reduction plan involved tracking whether "program offices are timely returning records".  *Infra*, Part II.B.5.  Woods' claims about her own unit's diligence mean little if a program office is not timely returning records, and her unit fails to follow up to ensure their return.

### 3. The causes Woods cites for the backlog are attributable to the Agencies' own unlawful and ill-considered decisions.

Woods states that APHIS has been unable to timely close FOIA requests and appeals because APHIS "has encountered setbacks due to increased FOIA requests and litigation."  Woods PP Decl. ¶ 10.  Woods fails to acknowledge, however, that the setbacks APHIS "encountered" are entirely of its own making.  As described previously, in February 2017, the APHIS Administrator blocked public access to the online Database housing APHIS' most frequently requested records.  It was both inevitable and entirely foreseeable that this action would result in a sharp increase in FOIA requests.  Moreover, Congress quickly made clear that it disapproved of the Administrator's decision and directed that the Database be restored and repopulated with the records it previously contained  .H. Rept. 115-232 to H.R. 3268 (July. 17, 2017).  Despite Congress' clear direction, Woods' Declaration admits that the Agencies did not repost many of the records previously available online.  Woods PP Decl. ¶ 13.  In the face of APHIS' recalcitrance, in December 2019

Congress forced the Agencies not only to restore the Database, but to post records entirely unredacted except for signatures. *Id.*, ¶ 35. Thus, the increase in FOIA requests that Woods cites was not only the result of the Agencies' own actions, it was the result of the Agencies' own *wrongful* actions.

Woods' Declaration identifies no preparation made by the Agencies prior to February 2017 to increase the FOIA unit's capacity to respond to the unavoidable effect of the Administrator's decision. And, rather than rising to the occasion, APHIS processed over 200 fewer requests in 2017 than the year prior. *Id.*, ¶ 14. Woods attributes this reduction in part to the fact that "APHIS had determined that additional privacy protection should be afforded to the records," meaning new redactions were being applied. *Id.*, ¶ 18. However, the "additional privacy protection" the Agencies adopted in 2017 was found unlawful in *HSUS v. APHIS*. Thus, Woods' Declaration again simply confirms that the Agencies' backlog sharply increased in 2017 as a result of the Agencies' own wrongful and unlawful actions.

Woods' reference to increased litigation is likewise self-incriminating. Woods states that APHIS was sued 16 times from FY16 to FY 19, but ten of these cases apparently involved one plaintiff. Woods PP Decl. ¶ 21. Woods does not identify the remaining six cases, but at least six of these cases were filed directly challenging either the wrongful removal of the Database or APHIS' policy of withholding non-exempt information, ruled unlawful in *HSUS v. APHIS*.[10] Again, Woods' declaration simply confirms that the Agencies' own wrongful and unlawful acts have "had a direct impact on being able to address the FOIA backlog." *Id.*

---

[10] *Animal Legal Def. Fund, et al. v. USDA, et al.*, Case Nos. 3:2017-cv-00949, 4:2017-cv-03903, 3:2019-cv-04567 (N.D. Cal.); *People for the Ethical Treatment of Animals, et al. v. USDA, et al.*, Case Nos. 1:2017-cv-00269, 1:2018-cv-01886 (D.D.C.); *People for the Ethical Treatment of Animals, et al. v. USDA, et al.*, Case No. 2:2018-cv-00306 (E.D. Va.); *HSUS v. APHIS, et al.*, Case Nos. 1:2018-cv-00646, 1:2019-cv-02458 (D.D.C.); *ASPCA v. APHIS, et al.*, Case No. 1:2018-cv-04559 (S.D.N.Y.); and this litigation.

**4.    The Agencies have not shown due diligence in addressing the backlog they created.**

As noted above, Woods' Declaration identifies no action the Agencies took to prepare for the inevitable increase in FOIA requests.  While the government asserts that the FOIA unit "has worked to successfully reduce [the backlog] over the last two years," Mem. at 3, this claim is false.  APHIS' backlog *increased* from 2018 to 2019 – there was no reduction.  Woods PP Decl. ¶ 14.  Furthermore, the efforts Woods recounts to address the backlog fail to show adequate due diligence by the Agencies.  For example, Woods' Declaration asserts that she has hired ten employees – during some unspecified time period – as part of her unit's backlog reduction efforts.  Woods PP Decl. ¶ 26.  However, it is entirely unclear from her declaration whether these employees filled new positions or backfilled existing positions Woods says were open due to attrition.  *Id*.  Nevertheless, USDA's Annual FOIA reports for FY 2016 and FY 2017 show Wood's FOIA unit added only <u>one</u> employee in the year following the removal of the Database, going from 22 to 23 full-time FOIA staff.  Hensley Decl., Ex. 29, at p. 33; *Id.*, Ex. 30, at Section IX.

**5.    Woods fails to reference USDA's actual backlog reduction plan.**

Perhaps the most remarkable omission from Woods' Declaration is the absence of any mention of the backlog reduction plan USDA adopted in 2018.  The USDA Chief FOIA Officer's Report, March 2019 states:

> If your agency had a backlog of more than 1,000 requests in Fiscal Year 2018, what is your agency's plan to reduce this backlog during Fiscal Year 2019?
>
> USDA is committed to reducing its backlog during Fiscal Year 2019.  Each component with a backlog will be required to report progress to the DFO on a monthly basis, more specifically, confirm (1) items received for the component have been properly logged; (2) program offices are timely returning records; and (3) workloads for FOIA professionals are evenly distributed.[11]

---

[11] Hensley Decl., Ex. 28 at p. 18.

To learn of APHIS' efforts, the ASPCA submitted a FOIA request seeking APHIS' monthly reports required under the plan. Hensley Decl., Ex. 8. APHIS responded that no such reports existed. *Id*. In fact, there were no reports because the Departmental FOIA Office ("DFO") inexplicably abandoned this backlog reduction plan for an "alternative approach". *Id*. The ASPCA's subsequent FOIA request to the DFO revealed that the DFO's alternative plan involved simply pulling backlog reports from a central system on a quarterly basis. *Id*. The records released by the DFO showed no indication the DFO monitored a key component of the original backlog reduction plan – whether program offices were timely returning records.

The DFO's only request of each unit was to periodically verify the accuracy of the report the office pulled. Hensley Decl., Ex. 39. On February 1, 2019, the DFO requested verification from USDA's FOIA directors for Q1. *Id*. at p. 2. Only five responded – Woods was not among them. *Id*. Six months later, the DFO sent out a request for verification of Q2. *Id*. at pp. 2-4. Again, Woods did not respond. A month later, an APHIS FOIA management analyst emailed the DFO asking if she was still seeking verification for Q1 and Q2. *Id*. at 1. The DFO responded that since she did not receive confirmation from APHIS, she used "the data in FX". *Id*.

The result of the DFO's alternative backlog reduction plan: Not only did APHIS' backlog *increase* in 2019, USDA's agency-wide backlog grew by 12.17% in 2019 while processing 26.46% *less* requests than it did in 2018.[12]Despite the failure of the DFO's alternate approach, the USDA has explicitly adopted it as its backlog reduction plan for FY 2020.

> If your agency had a backlog of more than 1,000 requests in Fiscal Year 2019, what is your agency's plan to reduce this backlog during Fiscal Year 2020?

---

[12] Hensley Decl., Ex. 7 at p. 14.

> USDA is committed to reducing its backlog during Fiscal Year 2020.  It will continue to monitor progress on a quarterly basis in the Department's enterprise wide FOIA tracking system.[13]

While the Agencies' 2020 backlog reduction plan is simply to "monitor progress on a quarterly basis," APHIS has shown no commitment even to participate in monitoring.  Failing to respond to the DFO's inquiries is not the conduct of an agency diligently working to reduce its backlog.

### 6. The Agencies fail to describe how they intend to conform with FOIA's mandate going forward.

In *Judicial Watch*, the court stated that, on remand, the agency will have the opportunity "to confirm how it intends in the future to conform to FOIA's mandate to make requested non-exempt records 'promptly available.'"  895 F.3d at 784.  Here, the Agencies have utterly failed to provide any such confirmation.  Woods' Declaration concludes by stating "it is APHIS' hope that the proactive posting of our most commonly requested records will reduce the number of incoming FOIA requests."  Woods PP Decl. ¶ 36.  Thus, other than merely planning to "monitor progress" toward reducing their backlog, and hoping that their workload will decrease, the Agencies have not even gestured at how they intend to comply with FOIA going forward.

In determining whether injunctive relief is appropriate, the Court should consider "the *bona fides* of the expressed intent to comply, the effectiveness of the discontinuance [of the violation], and, in some cases, the character of the past violations."  *Judicial Watch*, 895 F.3d at 783.  Here, the Agencies' violations of FOIA's mandate to provide prompt responses are uncorrected and ongoing, and their past violations, particularly their discriminatory application of an unlawful redaction policy, are egregious.  While Woods alleges the Agencies never "intentionally fail to comply with the FOIA statute," Woods PP Decl. ¶ 9, this is far from an expression of a genuine

---

[13] Hensley Decl., Ex. 7 at p. 16.

intention to affirmatively comply with FOIA's mandate. And, despite the overwhelming, undisputed evidence of repeated and ongoing failures to promptly respond, the Agencies continue to deny responsibility and blame events beyond their control, rather than acknowledging that these are problems of their own making.

Furthermore, once they were sued, the Agencies quickly fulfilled all but one of the requests at issue here, demonstrating they were able to do in three months, what they allegedly could not (or refused) to do in the last three years. *See* N. Teleanu letter to Court, Dkt. 25 (Jul. 1, 2019) at p. 1. The Agencies are capable of responding promptly; they choose not to. In these circumstances, injunctive relief is the only remedy for a policy and practice of violations that the Agencies obstinately refuse to acknowledge, much less correct. Therefore, even if the Court does not grant the ASPCA's cross-motion for summary judgment, the Agencies have not established that they are entitled to summary judgment on the ASPCA's policy or practice claim in any case.

## III.   THE AGENCIES UNLAWFULLY WITHHELD CERTAIN INFORMATION AND RECORDS PURSUANT TO FOIA EXEMPTIONS 4 AND 5.

As noted above, summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; *Celotex*, 477 U.S. at 322. An agency's decision to withhold information responsive to a FOIA request is subject to *de novo* review. 5 U.S.C. § 552(a)(4)(B); *Halpern*, 181 F.3d at 287 ("FOIA clearly contemplates judicial review of agency decisions to withhold information and provides that a reviewing court 'shall determine the matter *de novo* ....'" (quoting statute)). When an agency chooses to withhold information, "the burden is on the agency to sustain its action," 5 U.S.C. § 552(a)(4)(B), and "remains with the agency when it seeks to justify the redaction of identifying information in a particular document as well as when it seeks to withhold an entire document," *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991); *Halpern*, 181 F.3d at 287. This

burden includes "proving that the information sought by plaintiffs would not shed light on [the agency's] performance of its statutory duties. . . ." *Columbia Riverkeeper v. FERC*, 650 F. Supp. 2d 1121, 1130 (D. Or. 2009).

###### A.    The Information Redacted on the Basis of Exemption 4 is not "Confidential."

Defendants applied FOIA Exemption 4 to a total of nine records responsive to the ASPCA's requests.  The first eight of those records are responsive to the ASPCA's request for license renewal applications pertaining to USDA licensees Classy Creations ("Classy") and Sobrad LLC ("Sobrad").[14]  Defendants consistently redacted one category of information from these records—information about volume of sales and gross revenue (otherwise known as "Block 10" information).  Defendants inconsistently redacted a second category of information, the fee amount, from Classy's applications but released the same information in Sobrad records.  The fee amount reflects the license fee USDA charges pet dealers to obtain or renew a license and is based on the information provided in "Block 10."  *See* 9 C.F.R. § 2.1(d)(1).  For example, the annual license renewal fee for a dog breeder is based on 50 percent of the total gross amount derived from the sale of animals by the dealer or applicant during his or her preceding business year.  *See*  9 C.F.R. § 2.6(b).

Defendants have unlawfully redacted "Block 10" and fee information from license applications released in response to the ASPCA's FOIA requests.  Exemption 4 protects "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential."  5 U.S.C § 552(b)(4).[15]  In a recent decision, the Supreme Court observed that the ordinary meaning of the term "confidential" "suggest[ed] two conditions that might be required

---

[14] Hensley Decl., Ex. 15 (Sobrad) and Hensley Decl., Ex. 1 (Sobrad); *see* Hensley Decl., Ex. 16 (Classy).

[15] The ASPCA addresses the Agencies' claims of confidentiality only. The parties agree that the information at issue is "commercial or financial," is "obtained from a person," and is not "privileged."

for information communicated to another to be considered confidential." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2363 (2019). "In one sense, information communicated to another remains confidential whenever it is customarily kept private, or at least closely held, by the person imparting it. . . .  In another sense, information might be considered confidential only if the party receiving it provides some assurance that it will remain secret." *Id.*  That is, once shared with the government, the information might lose its confidential quality without the government's assurance of privacy. *Id.*  In *Food Marketing Institute*, however, there was "no need to resolve" whether the second condition was required, as the information's owner there "clearly satisf[ied] th[at] condition too." *Id*. at 2362.

Here, the Agencies make no assertion that they provided licensees any assurance, either express or implied, that "Block 10" or fee information from license applications would be held secret.  Having effectively conceded that they cannot establish that they have met one of the two conditions for finding confidentiality set forth by the Supreme Court, the Agencies rest their case on their determination that the other condition has been met.  Specifically, the Agencies argue "Block 10" and fee information is customarily kept private, or at least closely held, by licensees. Mem. at 13-16.

In support of their position, the Agencies once again offer the Declaration of FOIA Director Tonya Woods. *Id*. at 15-16.  However, Wood's Declaration offers only conclusory statements that fail to establish any factual basis supporting a finding that these categories of information have indeed been customarily treated as private or closely held.  Furthermore, Woods' claim that the withheld information is "confidential information that is not ordinarily or actually released to the public" is the opposite position the Agencies have taken for almost a decade.  Woods SJ Decl. ¶ 176.  In a 2012 "reverse-FOIA" case, USDA-licensed Missouri dog breeders and dealers sought

to prevent the USDA from releasing "Block 10" information from dog dealer license applications in response to a FOIA request, claiming that Exemption 4 precluded the disclosure of such information.[16] *Jurewicz v. USDA*, 891 F. Supp. 2d 147 (D.D.C. 2012), *aff'd*, 741 F.3d 1326 (D.C. Cir. 2014). In stark contrast to the position it defends in this matter before the Court, the USDA argued that "Block 10" information is *not* confidential information within the meaning of Exemption 4. *Id*. Although the *Jurewicz* decision was decided on the predecessor Exemption 4 standard before *Food Marketing Institute*, the record in *Jurewicz* demonstrates that the Block 10 information is not "confidential" under the test set out in *Food Marketing Institute*, either.

The *Jurewicz* court found that "Block 10" information was not private or closely held, noting "the USDA pointed out that similar information was already in the public domain: The fee each dealer pays to renew its license reflects the dealer's revenue from regulated activities, so competitors can already make ballpark estimates of an operation's net income. And annual APHIS inspection reports show the animal inventory at the time of inspection, so competitors already have some sense of the size and growth of an operation as well." *Jurewicz*, 891 F. Supp. 2d at 154 (internal quotations and citations omitted).[17] The court relied on the Declaration of Woods—the same declarant the Agencies rely on here—to find that fees paid by dealers were publicly available. *Id.*; *see also id.* at 154-55 ("APHIS has routinely released the amount of fees paid in response to FOIA requests." (quoting memorandum by T. Woods)). The Agencies should therefore be estopped from asserting that Block 10 and fee information found on USDA pet dealer license applications *are not* publicly available information. *Texas v. Penguin Grp. (USA), Inc (In re Elec.*

---

[16] The *Jurewicz* opinion refers to these categories of information as "Block 8" information but acknowledges that in some versions of the license application form, this information appears in "Block 10".

[17] APHIS inspection reports for both Sobrad and Classy reflecting animal inventory at the time of inspection are likewise publicly available on the ACIS database. *See Inspection Reports Search*, USDA (APHIS – Animal Care), *available at*: https://acis.aphis.edc.usda.gov/ords/f?p=118:203.

*Books Antitrust Litig.)*, No 11 MD 2293 (DLC), 2014 U.S. Dist. LEXIS 57414, at *38-39 (S.D.N.Y

Apr. 24, 2014) ("[W]here a party assumes a certain position in a legal proceeding, and succeeds in

maintaining that position, he may not thereafter, simply because his interests have changed,

assume a contrary position[.]" (citations omitted)).

Here, the Agencies' *Vaughn* Index offers the same explanation for application of

Exemption 4 that the USDA opposed, and the court rejected, in *Jurewicz*. *See* Woods SJ Decl.,

Ex. 29 (*Vaughn* Index at 6 &12).  The Agencies do not explain this reversal.  Likewise, they fail

to explain why the same type of fee information they redacted from Classy's license applications

was not redacted, and therefore, in the Agencies' view, *not confidential*, for Sobrad.

Assuming *arguendo* that the Agencies could support their argument that "Block 10" and

fee information is customarily kept private or closely held by licensees (which they cannot), the

Agencies' argument that this Court should only require the Agencies to show that they have met

one of the conditions for determining confidentiality observed by the Supreme Court in *Food

Marketing Institute* is tenuous at best.  The Agency embarks on an interpretation of the statutory

history of the FOIA to support its position.  Mem. at 14.  However, the Supreme Court expressly

*rejected* using the legislative history to interpret Exemption 4.  *Food Mktg. Inst.*, 139 S. Ct. at

2364.

Though it declined to decide the issue in *Food Marketing Institute*, the Supreme Court

would likely rule that the government must promise to keep information confidential for

Exemption 4 to apply because the sources on which it relied for interpreting the statutory language

require such a commitment, and the Court cited approvingly to existing case law imposing that

requirement.  *Id.* at 2363.  And this case demonstrates precisely why both conditions referenced

by the Court in *Food Marketing Institute* should be met for information to be considered

confidential within the meaning of Exemption 4.  Here, the dealers conduct a regulated activity and are mandated by law to obtain a USDA license, comply with the AWA, and open their facility to federal inspection.  As the Agency demonstrated in *Jurewicz*, disclosure of "Block 10" information enables the public to monitor the Agencies' administration and enforcement of the AWA.  *Jurewicz*, 891 F. Supp. 2d at 157. It identified three public interests that remain true today: "First, disclosure would help the public decide whether the USDA has followed Congress's directives to collect reasonable fees for licenses issued and to assess the fee on an equitable basis. . . . [s]econd, disclosure would help the public gauge the effectiveness of USDA inspections [and] [t]hird, disclosure would help the public evaluate whether the agency is properly assessing licensing fees. . . ."  *Id.*  (internal quotations and citations omitted).  Thus, when information that is customarily kept private or closely held is critical to the public's understanding of an agency's administration of federal law, allowing the information providers' historical handling of such information to be the sole determining factor for deeming information subject to Exemption 4 would completely undermine the purpose of FOIA to "ensure an informed citizenry" and "hold the governors accountable to the governed."  *Am. Small Bus. League v. U.S. Dep't of Def.*, 411 F. Supp. 3d 824, 829 (N.D. Cal. 2019) (citation omitted).

Furthermore, the Agencies' reasoning for applying Exemption 4 to "Block 10" and fee information has never followed controlling law.  When they redacted this information before *Food Marketing Institute* was decided, the Agencies ignored their previous position and the court's decision in *Jurewicz* when they determined that "Block 10" and fee information were "confidential."  *See* Hensley Decl., Exs. 31-32.  While the Agencies now rely on an ill-advised interpretation of *Food Marketing Institute* to justify their withholdings under Exemption 4, the Agencies reprocessed relevant records twice during this litigation after *Food Marketing Institute*

was decided and on both occasions issued amended determination letters that fail to mention *Food Marketing Institute*. *See* Hensley Decl., Exs. 33-34. The Agencies' application of Exemption 4 to "Block 10" and fee information on license applications defies both logic and law, and inexplicably runs afoul of the position the Agencies have historically defended.

The Agency also failed to meet its burden to prove Exemption 4 applies to the ninth record at issue—a photograph released almost entirely redacted in response to the ASPCA's request for March 2017 inspection photographs.[18]  The photograph at issue relates to a documented violation of the AWA recorded during inspection.   The Agencies claim this photograph was lawfully redacted under Exemption 4 because it reveals "broker instructions" that "contain proprietary methods of how the licensee operates to ensure proper care of animals, but are not yet approved by the attending veterinarian of the licensee" and are "considered confidential and would qualify as private and not released during the approval process." Mem. at 16.  These claims do not support a finding of confidentiality under either of the conditions recognized in *Food Marketing Institute*. Specifically, the Agencies do not state that the information is customarily private or closely held by the licensee or that the Agencies provided any assurance the information would be kept secret.

The Agencies' *Vaughn* Index and Declaration also fail to explain the relevance of the suggestion that these "proprietary methods" are confidential because they are "not yet approved by the attending veterinarian." *See* Woods SJ Decl., Ex. 29 (*Vaughn* Index at 1).  In fact, the Agencies do not even explain what they mean by "broker instructions." *Id.*  Any licensee decision "relating to the care of animals at a USDA licensed facility" could, in theory, be considered a "proprietary method" under the Agencies' argument here.  Thus, in the absence of a sufficiently detailed *Vaughn* Index and Declaration explaining the basis for Exemption 4 application, the

---

[18] Hensley Decl., Ex. 14.

Agencies are unable to show that they lawfully applied the Exemption.  Indeed, an Exemption 4

claim in this context would result in a staggering application of Exemption 4 that not only

undermines the presumption of broad disclosure in the FOIA context, but explicitly conceals

information the Agencies concluded constituted a violation of the AWA.

**B.      Defendants Must Disclose Certain Information Withheld Under Exemption 5.**

The Agencies have likewise improperly withheld certain information from Plaintiff,

wrongfully claiming that it falls under Exemption 5.  Thus, the Court should grant Plaintiff's

Cross-Motion as it relates to this information and order the Agency to disclose the documents

discussed *infra* at Part III.B.2.  Additionally, Defendants' Motion should be denied because the

Agencies fail to meet their burden of demonstrating that they properly applied Exemption 5 to the

Ruby Fur Farm documents.

In order to prevail at summary judgment, an agency's declaration and *Vaughn* Index must

"describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the

information withheld logically falls within the claimed exemption, and are not controverted by

either contrary evidence in the record nor by evidence of agency bad faith."  *Seife v. U.S. Dep't of

State*, 298 F. Supp. 3d 592, 607 (S.D.N.Y. 2018).  These submissions are insufficient when "the

agency's claims are conclusory, merely reciting statutory standards, or if they are too vague or

sweeping."  *Id.* (citations omitted).

FOIA exempts from disclosure "inter-agency or intra-agency memorandums or letters

which would not be available by law to a party other than an agency in litigation with the agency

. . . ."  5 U.S.C. § 552(b)(5).  Exemption 5 encompasses the traditional common law privileges

against disclosure in civil litigation, including the deliberative process privilege and the attorney-

client privilege.  *Seife*, 298 F. Supp. 3d at 606-07.

The deliberative process privilege "focuses on documents 'reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Grand Cent. P'Ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999) (quoting *Hopkins v. HUD*, 929 F.2d 81, 84-85 (2d Cir. 1991)). As such, the types of documents that may be considered predecisional include: "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Id.* (quoting *Ethyl Corp. v. EPA*, 25 F.3d 1241, 1248 (4th Cir. 1994)).

An agency cannot withhold information under the deliberative process privilege unless it is both predecisional and deliberative. *Id.* Information is predecisional if it is "prepared in order to assist an agency decisonmaker in arriving at his decision." *Id.* (quoting *Hopkins*, 929 F.2d at 84). Information is deliberative if it is "actually … related to the process by which policies are formulated." *Id.*

In determining whether a document is predecisional, courts have considered whether an agency can "(i) pinpoint the specific agency decisions to which the document correlates, (ii) establish that its author prepared the document for the purpose of assisting the agency official charged with making the agency decision, and (iii) verify that the document precedes, in temporal sequence, the decision to which it relates." *Seife*, 298 F. Supp. 3d at 614 (citation omitted). In determining whether a document is deliberative, courts have considered "whether the document '(i) formed an essential link in a specified consultative process, (ii) reflects the personal opinions of the writer rather than the policy of the agency, and (iii) if released, would inaccurately reflect or prematurely disclose the views of the agency.'" *Id.* (quoting *Grand Cent. P'Ship*, 166 F.3d at 482).

In certain circumstances, a document may be predecisional and deliberative, yet still not be subject to Exemption 5.  *See ACLU v. NSA*, 925 F.3d 576, 595-97 (2d Cir. 2019) (describing "express adoption," where "a document first drafted as legal or policy advice [becomes] an agency's 'effective law and policy.'").  For example, documents that reflect an agency's final decisions and reasoning must be disclosed.  *Id.*; *Nat'l Day Laborer Org. Network v. U.S. ICE*, 827 F. Supp. 2d 242, 251-53 (S.D.N.Y. 2011) ("[T]he need to protect honest deliberation from public scrutiny disappears once an agency has adopted the logic of a document . . . .").  When that occurs, "the reasoning becomes that of the agency and becomes [the agency's] responsibility to defend." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 161 (1975).  In addition, postdecisional and "purely factual" material is not subject to Exemption 5.  *Id.* at 151-52; *Grand Cent. P'ship*, 166 F.3d at 482 (citing *Hopkins*, 929 F.2d at 85).

"The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purposes of obtaining or providing legal assistance." *Brennan Ctr. for Justice at N.Y. Univ. Sch. of Law v. U.S. Dep't of Justice*, 697 F.3d 184, 207 (2d Cir. 2012) (quoting *U.S. v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011).  "[I]t is vital to [a claim of attorney client privilege] … that the communications between client and attorney were made in confidence and have been maintained in confidence." *Id*. (quoting *Mejia*, 655 F.3d at 134).

### 1. Defendants' declaration and Exemption 5 *Vaughn* Index are generally insufficient.

Woods' Declaration in support of summary judgment and accompanying *Vaughn* Index, Woods SJ Decl., Ex. 30 ("Exemption 5 *Vaughn* Index") (collectively, Defendants' "submissions"), are insufficient to substantiate their withholdings under Exemption 5.  Woods' Declaration does exactly what it should not do: it attempts to recite the law and makes conclusory statements about

the withheld information.  *See* Woods SJ Decl. ¶¶ 178-83.  Moreover, the Exemption 5 *Vaughn* Index is replete with vague references to the Agencies' "plans" and "next steps" and nearly every entry contains the same or substantially similar conclusory justifications for withholding information pursuant to the deliberative process privilege or the attorney client privilege.  *See*, *e.g.*, Exemption 5 *Vaughn* Index for 000410-000412 (asserting communications relate to "APHIS's plan" and "[d]isclosure would jeopardize the candid and comprehensive considerations essential for efficient and effective agency decision-making").  Thus, Defendants' submissions are insufficient and their Motion should be denied.

    Furthermore, as discussed below,[19] Defendants' submissions and evidence in the record show that certain purportedly deliberative material is not predecisional because several of the events to which the material relates *had already occurred*.  *See Seife*, 298 F. Supp. 3d at 618-19 (finding defendants' submissions insufficient where, *inter alia*, the events occurred on the same date as the withheld emails).  Additionally, Defendants' submissions and evidence in the record show that certain withheld material is not actually part of the give and take of the deliberative process.  *See id.* (finding defendants' withholdings unsupported because the role of the emails in the deliberative process was not apparent).  Finally, Defendants' submissions and evidence in the record show that, certain material likely contains purely factual information or is not protected by attorney client privilege.  Thus, the Court should order the Agencies to disclose the documents discussed below.

---

[19] The specific materials discussed below, *infra* at Part III.B.2, are examples of how Defendants' submissions and evidence in the record strongly indicate that certain withholdings are insufficient and improper.  However, Plaintiff contends all Defendants' withholdings are unsupported, and reserves the right to challenge any additional specific material the Court requests or that Defendants claim should be deemed sufficient or proper.

### 2.    Certain Ruby Fur Farm documents do not fall within Exemption 5.

Defendants improperly applied the deliberative process privilege or the attorney-client privilege to certain documents concerning Ruby Fur Farm.  The timeline of events established by Defendants' submissions and records that the Agencies produced indicate that Defendants wrongly withheld documents that reflect the Agencies' final decisions and reasoning about its oversight (or lack thereof) of a facility that repeatedly violated the law and caused animals to suffer.

Between June 12, 2017 and July 25, 2017, Agency officials visited Ruby Fur Farm at least five times, documenting egregious conditions in which the licensee housed 290 raccoons.  SMF, ¶ 54 (citing Hensley Decl., Ex. 17).  During those visits, temperatures in the raccoon breeding facility ranged from 90 to 101 degrees and heat indexes ranged from 101 to 123 degrees.  *Id.*, ¶ 55.  Officials described animals who were experiencing heat stress and suffering, as indicated by, *inter alia*, panting, severely increased respiratory rates, open mouth breathing, drooling, laying on their sides, backs and abdomens with their legs splayed, and lethargy.  *Id.*, ¶ 56.

On July 21, 2017, the Agency issued a confiscation notice for twenty-six raccoons, ten of whom were removed from the facility that day.  *Id.*, ¶ 57 (citing Hensley Decl., Ex. 18).  On July 22, 2017 and July 23, 2017, Agency officials continued to make plans to remove the remaining raccoons subject to the confiscation notice.  *Id.*, ¶ 58 (citing Hensley Decl., Ex. 19).  However, on July 24, 2017, the APHIS Deputy Administrator and a Senior White House Advisor in the Office of the Secretary received an e-mail from The Cavalry Group questioning the legitimacy of the Agency's actions, stating that Ruby Fur Farm had legal representation, and demanding that the Agency immediately halt the confiscation.  *Id.*, ¶ 59 (citing Hensley Decl., Ex. 20).  The Deputy Administrator responded to the e-mail stating that she would instruct her team to "pause additional activity at the facility" pending review of the matter.  *Id.*

On July 25, 2017, Agency officials returned to Ruby Fur Farm for a focused inspection and documented animals continuing to suffer from extreme heat.  *Id.*, ¶ 62 (citing Hensley Decl., Ex. 26).  Despite the licensee's ongoing egregious AWA violations, the officials did not remove the remaining animals at that time as originally planned "[d]ue to circumstances that were out of the control of the inspectors."  *Id.*, ¶ 63 (quoting Hensley Decl., Ex. 17).  On July 26, 2017—one day after Agency officials found raccoons continuing to suffer from extreme heat—the raccoons originally confiscated on July 21, 2017 were returned to the licensee.  *Id.*, ¶ 64 (citing Hensley Decl., Ex. 18).  At that time, the Agency constructively rescinded its confiscation notice.  *Id.*

The communications between APHIS, the Office of General Counsel ("OGC"), and the Office of the Secretary ("OSEC") in the hours and days immediately following The Cavalry Group's July 24, 2017 e-mail and the Deputy Administrator's "pause" in activities are heavily redacted.  *See* Hensley Decl., Exs. 21-25.  However, during that time, the Agency made and executed critical decisions, such as conducting an inspection and reversing confiscation activities.  Defendants' broad application of Exemption 5 shields this information from view, despite significant public interest in the Agency's decisions and policies.  *See NLRB*, 421 U.S. at 152 (stating that "[t]he public is only marginally concerned with reasons supporting a policy which an agency has rejected … [i]n contrast, the public is vitally concerned with the reasons which did supply the basis for an agency policy actually adopted").

### a.    *The July 25, 2017 "Ruby Fur Farm update" e-mail.*

Defendants' submissions and evidence in the record strongly indicate that a July 25, 2017 e-mail from the APHIS Deputy Administrator to the Administrator and Associate Administrator is neither predecisional nor deliberative.  Hensley Decl., Ex. 37.  Moreover, even if the deliberative process privilege does apply to the Deputy Administrator's initial communication, Defendants

failed to show that it applies to the Administrator's subsequent communication containing the e-mail.

First, the Exemption 5 *Vaughn* Index only refers to APHIS' "plan" to justify withholding several documents. Exemption 5 *Vaughn* Index at 000410-000412. Defendants' justification fails to pinpoint any specific decision to which the withheld material relates.

Second, Defendants do not show that the withheld e-mails preceded any final decisions related to matters referenced in the description of the document. *See id.* In fact, the APHIS Administrator identifies the withheld portion of the e-mail chain as "the APHIS plan" on July 25, 2017—the same day that Defendants inspected Ruby Fur Farm without confiscating any additional animals and that the Animal Rescue League of Iowa notified the attorney for Ruby Fur Farm that it would be returning the previously confiscated animals to the facility.[20] Defendants do not show how the withheld portions of the email chain preceded the Agencies' decision to conduct the inspection, or explain how the withheld communications preceded the Agencies' decisions that were *executed* when the inspection occurred that day. Instead, this sequence strongly suggests the withheld part of the email chain was drafted after the Agencies had made their decisions regarding inspection and confiscation, and thus would not qualify as predecisional.

Third, even if the e-mail from the Deputy Administrator preceded the Agencies' final decisions, the statements were "expressly adopted" by the Agency when the Administrator later represented it as "the APHIS plan." Hensley Decl., Ex. 22. At that point, it became "an agency's 'effective law and policy,'" and was no longer subject to Exemption 5. *ACLU*, 925 F.3d at 595-97.

---

[20] The Animal Rescue League apparently made this notification following two days of conversations with the APHIS Deputy Administrator. *See* Hensley Decl., Exs. 35-36.

Fourth, Defendants failed to show that the communication from the Deputy Administrator reflects her personal opinion offered as part of the deliberative process, rather than the policy of the Agencies.  To the contrary, the Exemption 5 *Vaughn* Index admits that the e-mail discusses the *results* of consultation within the Agency, not the ongoing give and take of the deliberative process.  Neither the APHIS Administrator, nor the Deputy Administrator, nor the Senior White House Advisor appear to solicit input on the plan or indicate that the plan is subject to further deliberation.  If anything, the unredacted portions of the e-mail chain show that there is high-level agreement on the plan.  For these same reasons, Defendants failed to establish that the withheld material would inaccurately or prematurely disclose the Agencies' positions.

Fifth, this e-mail does not meet the requirements of attorney client privilege, either as originally sent by the Deputy Administrator or as later forwarded by the Administrator.  Initially, the communication is not between a client and their attorney.  The OGC was merely copied on the Deputy Administrator's initial e-mail and was not included at all on the Administrator's subsequent communication.

Additionally, the FOIA Director is the only official attesting to the confidentiality of the withheld material.  *See* Woods SJ Decl. ¶ 181 (stating that "APHIS has held this information confidential and has not waived the privilege").  This conclusory statement apparently applies to all instances where the Agencies claim attorney client privilege.  However, no one involved in the e-mail chain has attested to whether the communication was intended to be, and was in fact kept, confidential.  During this time, Agency officials were in contact with third parties—namely, the Animal Rescue League of Iowa, The Cavalry Group, and attorneys for the licensee—regarding the exact issues to which Defendants claim this e-mail relates.[21]   Despite these communications,

---

[21]  Discussions with The Cavalry Group and attorneys for the licensee continued into August 2017, where Defendants—including OGC attorneys—apparently discussed whether Agency officials acted "inappropriately" in

Defendants failed to provide any additional information from any Agency officials that could be used to establish confidentiality, such as a declaration from the Deputy Administrator, the Administrator, or the OGC attorney copied on the initial e-mail.

Furthermore, Defendants have not established that either the initial e-mail or the e-mail as forwarded were sent for the purpose of obtaining or providing legal advice.  The limited unredacted portions of the initial e-mail indicate that the Deputy Administrator was providing an update to APHIS officials, not seeking legal advice from OGC.  Moreover, the subsequent communication indicates that the Administrator forwarded the e-mail to a Senior White House Advisor not to obtain or provide legal advice, but simply to inform him of "the APHIS plan."

Finally, to the extent that the Administrator expressly adopted the initial e-mail as the Agencies' policy, it is no longer subject to attorney client privilege.[22]

### b.    The July 26, 2017 "RFF" e-mail.

Defendants' submissions and evidence in the record strongly indicate that a July 26, 2017 e-mail from the APHIS Deputy Administrator to program staff providing an update on Ruby Fur Farm is neither predecisional nor deliberative.  Hensley Decl., Ex. 21.  First, it is unclear from the Exemption 5 *Vaughn* Index whether Defendants claim that this e-mail relates solely to a draft administrative complaint, or whether it involves other plans to address "non-compliances" at Ruby

---

their contact with Ruby Fur Farm from July 20, 2017 to July 28, 2017.  *See* Hensley Decl., Ex. 37.  The USDA also made statements to the media regarding the Agency's actions.  Karin Burlliard & William Wan, *Caged Raccoons Drooled in 100-Degree Heat. But Federal Enforcement has Faded.*, Wash. Post (Aug. 22, 2019), https://www.washingtonpost.com/science/caged-raccoons-drooled-in-100-degree-heat-but-federal-enforcement-has-faded/2019/08/21/9abf80ec-8793-11e9-a491-25df61c78dc4_story.html ("In its statement to The Post, the USDA declined to say why it reversed the confiscation but suggested that inspectors had not given Ruby Fur sufficient time to correct the problem.").

[22] "Like the deliberative process privilege, the attorney-client privilege may not be invoked to protect a document adopted as, or incorporated by reference into, an agency's policy."  *Nat'l Council of La Raza v. U.S. Dep't of Justice*, 411 F.3d 350, 360 (2d Cir. 2005); *Brennan Ctr. for Justice*, 697 F.3d at 208 (stating that "*La Raza* establishes that when a document has been relied upon sufficiently to waive the deliberative process privilege, that reliance can have the same effect on the attorney-client privilege.").

Fur Farm.  To the extent it includes other plans to address violations, such decisions had already been made.  On July 25, 2017, the Agency completed an inspection and decided not to confiscate any additional animals "[d]ue to circumstances that were out of the control of the inspectors." Hensley Decl., Ex. 17.  On July 26, 2017, the animals that had already been confiscated were returned, Hensley Decl., Ex. 35, at which time, the Agencies constructively rescinded the confiscation notice.  Hensley Decl., Ex. 18.  Thus, the July 26, 2017 email could not be predecisional as to those plans.

Second, Defendants fail to show that the e-mail constitutes any link in a consultative process.  The withheld document is a single communication, not an e-mail chain that could show the ongoing deliberations.  The Deputy Administrator simply states that she is providing "[a] quick update on RFF" and concludes by thanking her staff for their work.  Thus, the e-mail appears to be a communication from a superior officer—the Deputy Administrator—intended to inform the lower-level officers of the status of the Ruby Fur Farm matter.  There is no indication that the Deputy Administrator was offering her personal opinion on the plan, as opposed to the Agency's position, nor is there any indication that the Deputy Administrator was soliciting input from her subordinates or otherwise seeking further deliberation about the matter.[23]

Third, this e-mail does not meet the requirements of attorney client privilege.  Initially, the communication is not between a client and their attorney.  The sender and all the recipients are APHIS officials.  OGC is not copied or otherwise referenced in the limited unredacted portions of the e-mail.

Additionally, no one involved in the e-mail has attested as to whether the communication was intended to be, and was in fact kept, confidential.  As discussed above, the only assurance of

---

[23] Defendants also failed to show that the e-mail from a superior to her subordinates is not binding on agency officials and therefore part of the Agency's "working law."  *See ACLU*, 925 F.3d at 593-95.

confidentiality that Defendants provide is a conclusory statement in Woods' Declaration. However, the Deputy Administrator—the sender of the e-mail—was one of the primary agency officials in contact with third parties at the time. Despite these communications, Defendants failed to provide any additional information from any Agency officials to establish confidentiality.

Furthermore, Defendants have not established that the e-mail was sent for the purpose of obtaining or providing legal advice. Again, OGC is not copied or otherwise referenced in the limited unredacted portions of the e-mail. Instead, it appears that the Deputy Administrator is merely providing "a quick update" to her staff, which does not relate to obtaining or providing legal advice.

        **c.**    ***The July 27, 2017 "FW: Urgent: Unlawful USDA Confiscation in Iowa Underway" e-mail.***

Defendants' submissions and evidence in the record strongly indicate that a July 27, 2017 e-mail from the APHIS Deputy Administrator to the Associate Administrator, copying the Administrator, is neither predecisional nor deliberative. Hensley Decl., Ex. 23.[24] First, by simply referring to APHIS's "plan" in its justification for withholding the document, Defendants fail to pinpoint any specific decision to which the withheld material relates. *See* Exemption 5 *Vaughn* Index at 000451-453. To the extent that Defendants reference decision-making processes in their description of the document, they fail to verify that the e-mail precedes any final decisions on those matters. In fact, as discussed above, by the time the Deputy Administrator sent this e-mail on the morning of July 27, 2017, Defendants had already inspected Ruby Fur Farm, decided not to confiscate any additional animals, coordinated the return of the animals that had already been

---

[24] Plaintiff is not challenging the redactions applied to the July 24, 2017 e-mails contained in this document at this time.

confiscated, and constructively rescinded the confiscation notice.  Thus, the July 27, 2017 e-mail could not be predecisional as to those plans.

Second, Defendants failed to show that the e-mail constitutes any link in a consultative process.  The limited unredacted portions indicate that the Associate Administrator requested an update on the Ruby Fur Farm matter and that the Deputy Administrator responded by sharing the Agency's plan or position, "based on" earlier events or communications.  There is no indication that the Deputy Administrator was offering her personal opinion, nor is there any indication that the contents of the e-mail are subject to further deliberation.  For these same reasons, Defendants have failed to show that the withheld material would inaccurately or prematurely disclose the Agencies' positions.

### d.    *The "Ruby Memo, 072517".*

Defendants' submissions and evidence in the record strongly indicate that a July 25, 2017 memorandum regarding Ruby Fur Farm—which Defendants withheld in full—is neither predecisional nor deliberative.  *See* Hensley Decl., Ex. 21, at 000370-000380; Ex. 25, at 001488-001492.

As an initial matter, the Exemption 5 *Vaughn* Index is internally inconsistent with respect to this document.  *Compare* Exemption 5 *Vaughn* Index at 000369, attach. 000370-000380 (addressing the withholding of this memorandum in conjunction with a draft administrative complaint and stating that both documents "do not accurately reflect the agencies [sic] final decision") *with id.* at 001479, attach. 001488-001492 (addressing the withholding of a draft of this memorandum in conjunction with notes from the July 21, 2017 inspection and stating that both documents have been withheld in full "to protect information which would reveal pre-decisional communications among government personnel such as discussion on next steps in the RFF

matter").[25]  Due to this inconsistency, it is unclear whether Defendants claim that the memorandum relates solely to the draft administrative complaint, or whether it relates to other next steps, or both. Thus, Defendants failed to pinpoint the specific decisions to which the memorandum relates.

Second, Defendants failed to show that the memorandum continued to be deliberative after consultation with OGC on July 25, 2017.  *See* Hensley Decl., Ex. 38.  In the days that followed, the Deputy Administrator shared the memorandum with subordinate officers, *see* Hensley Decl., Ex. 21, and with the Associate Administrator.  *See* Hensley Decl., Ex. 23.  In the latter communication, the Deputy Administrator characterizes the document as a "summary memo" on the Ruby Fur Farm matter.  *Id.*  There is no indication that that memorandum contains her personal opinions, or anything more than a description of the Agencies' plan.

Third, by the time this "summary memo" was communicated to both program staff and the Associate Administrator, the Agencies had already made several significant decisions, as discussed above.  To the extent that the memorandum reflects the Agencies' final decisions and reasoning with respect to those actions, it should be disclosed.

Additionally, Defendants' submissions and evidence in the record strongly indicate that this memorandum contains at least some "purely factual" material.  The only attempt that Defendants make to establish that they properly disclosed all factual information is a conclusory statement in the FOIA Director's Declaration.  *See* Woods SJ Decl. ¶ 180 (stating that "[w]here possible, factual and non-deliberative information is being released").  However, Defendants

---

[25]Defendants' decision to address all these documents together in the Exemption 5 *Vaughn* Index creates confusion about which specific Bates numbers correlate to which specific documents.  Plaintiff is challenging the memorandum, which Defendants combined with a draft administrative complaint.  *See* Hensley Decl., Ex. 21, at 000370-000380. Plaintiff is not challenging Defendants' withholding of the draft administrative complaint at this time, *see id*, nor is Plaintiff challenging the draft of the memorandum that was subject to consultation with OGC at this time, except to the extent it contains purely factual material.  *See* Hensley Decl., Ex. 25, at 001488-001492.  Plaintiff is challenging Defendants' withholding of the notes from the July 21, 2017 inspection.  *See id.*

withheld this document in full, despite the fact that it is repeatedly described as a "summary" of the Ruby Fur Farm matter.  *See* Hensley Decl., Ex. 38 (stating that the memo "summarizes the Ruby matter."); Hensley Decl., Ex. 23 (referring to "the summary memo").  The Deputy Administrator's repeated references to this document as a "summary" indicate that it contains factual material that should be disclosed.

Furthermore, in the month and a half prior to the date of the summary memorandum, Agency officials had visited the facility five times, recording facts and documenting inhumane conditions that caused animals to suffer.  In the days immediately preceding the summary memorandum, the Agency had issued a confiscation notice, worked with a third party to remove animals from the facility, and communicated with other third parties affiliated with a licensee. Given the many facts relevant to the Ruby Fur Farm matter at the time, it is unlikely that a summary memorandum would contain absolutely no factual information that could be disclosed.

### e.    *"Ruby Confiscation, Welch"*.

Defendants improperly withheld a document titled "Ruby Confiscation, Welch" in full, despite strong indications that it consists entirely of "purely factual" material.  Hensley Decl., Ex. 25.  Defendants attempt to justify their withholding as necessary "to protect information which would reveal pre-decisional communications among government personnel such as a discussion on the next steps in the RFF matter."  Exemption 5 *Vaughn* Index at 001479. However, Defendants describe this document as "notes from the inspection," *id.*, and the Deputy Administrator refers to it as "a summary of the inspection from July 21."  Hensley Decl., Ex. 24.  Again, it is highly unlikely that this document—containing notes and/or a summary of the July 21, 2017 inspection—would contain absolutely no factual information that could be disclosed.

### 3. Defendants failed to demonstrate that disclosing the withheld material would harm interests protected by Exemption 5.

As amended in 2016, FOIA allows an agency to withhold material only if it "reasonably foresees that disclosure would harm an interest protected by an exemption…." 5 U.S.C. § 552 (a)(8)(A)(1); *NRDC v. EPA*, 2019 U.S. Dist. LEXIS 124353, at *2 (S.D.N.Y. 2019). This provision places "an independent and meaningful burden on agencies." *Id.* (*citing Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 375 F. Supp. 3d 93, 100 (D.D.C. 2019)). "[A]n agency 'must explain how a particular exemption 5 withholding would harm the agency's deliberative process.'" *Id.* (quoting *Rosenberg v. U.S. Dep't of Def.*, 342 F. Supp. 3d 62, 78 (D.D.C. 2018)). The agency cannot meet its burden by offering perfunctory or boilerplate language that reflects the policy goals of the exemption. *See id.* (citing *Rosenberg*, 324 F. Supp. 3d at 78-79; *Judicial Watch*, 375 F. Supp. 3d at 100-01).

Defendants fail to show how the disclosure of any specific withheld material would harm the Agencies' deliberative processes. Woods' Declaration does not address reasonably foreseeable harm with respect to any specific withheld material. Instead, it contains a conclusory statement for all purportedly deliberative material that merely reflects the policy goals of the exemption. Woods SJ Decl. ¶ 180 (stating that disclosure of the withheld material "would discourage candid discussions within the agency, thereby inhibiting APHIS employees from freely exchanging their ideas … and undermining its ability to perform its mandated functions"). Moreover, the Exemption 5 *Vaughn* Index contains the same perfunctory statement for deliberative process privilege entries. Exemption 5 *Vaughn* Index (stating throughout that "[d]isclosure would jeopardize the candid and comprehensive considerations essential for efficient and effective agency decision-making"). Therefore, Defendants have not met their burden of establishing that disclosure of any specific withheld material would cause reasonably foreseeable harm.

### 4.    Defendants must disclose all reasonably segregable information.

FOIA requires an agency to disclose "[a]ny reasonably segregable portion of a record" even though other portions may be lawfully withheld.  5 U.S.C. § 552(b).  An agency "must provide a detailed justification for its decision that non-exempt material is not segregable."  *Knight First Amendment Inst. at Columbia Univ. v. DHS*, 407 F. Supp. 3d 334, 343 (S.D.N.Y. 2019).  In addition, "[a] district court 'must make specific findings of segregability regarding the documents to be withheld' before ruling that an agency properly invoked a FOIA exemption."  *Id.* (citing *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007)).  Ultimately, all non-exempt material must be disclosed unless it is "inextricably intertwined" with exempt material.  *See id.*

Defendants failed to provide a detailed justification regarding segregability, relying only on conclusory statements in Woods' Declaration intended to cover all the responsive documents related to this case.  *See* Woods SJ Decl. ¶ 188.  Those conclusory statements do not constitute an adequate segregability analysis because it is impossible to discern the Agencies' justification for failing to disclose nonexempt material in any individual document withheld under Exemption 5. *See e.g., Knight First Amendment Inst.*, 407 F. Supp. 3d at 348-49 (finding that the agency failed to provide an adequate segregability analysis for a memorandum containing factual information); *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260-61 (D.C. Cir. 1977) (requiring a more detailed description than conclusory statements to show the agency's reasoning with respect to any individual documents).  As such, Defendants failed to meet their burden and their Motion should be denied.[26]

---

[26] Defendants inconsistently claim to have disclosed all non-exempt material and to have disclosed all non-exempt material that is not inextricably intertwined with exempt material.  *Compare* Woods SJ Decl. ¶ 188 (stating that "[t]here is no additional reasonably segregable information to release because the redactions have been drawn to withhold *only* exempt material) (emphasis added) *with* Mem. at 34 (stating that "no further segregation could be made

Additionally, Defendants must disclose all reasonably segregable information contained in the document discussed *supra* at Part III.B.2. As discussed above, Defendants' submissions and evidence in the record show that those documents very likely contain non-deliberative, non-privileged, or factual information that should be disclosed.

## CONCLUSION

For the foregoing reasons, the ASPCA respectfully requests that the Court deny Defendants' Motion, and grant Plaintiff's Cross-Motion for summary judgment.

Dated: New York, New York
        May 18, 2020

                                   Respectfully Submitted,

                                   COOLEY LLP

                                   */s/ Erin M. Estevez*
                                   Erin M. Estevez (*admitted pro hac vice*)
                                   Bonnie Weiss McLeod (*admitted pro hac vice*)
                                   1299 Pennsylvania Ave.
                                   Suite 700
                                   Washington, D.C. 20004
                                   Phone: (202) 728-7065
                                   Fax: (202) 842-7899
                                   eestevez@cooley.com
                                   bweissmcleod@cooley.com

                                   Kaitland M. Kennelly (KK-9574)
                                   55 Hudson Yards
                                   New York, New York 10001-2157
                                   Phone: (212) 479-6643
                                   Fax: (212) 479-6275
                                   kkennelly@cooley.com

                                   and

---

without disclosing exempt information."). Neither claim is sufficient to meet Defendants' burden, as the former stretches the bounds of credulity and the latter is conclusory and unsupported.

Jennifer H. Chin (JC-6317)
Robert G. Hensley (*admitted pro hac vice*)
Tamara Y. Feliciano (*admitted pro hac vice*)
ASPCA
520 8th Avenue, 7th Floor
New York, New York 10018
Phone: (212) 876-7700
jennifer.chin@aspca.org
robert.hensley@aspca.org
tamara.feliciano@aspca.org

*Attorneys for Plaintiff*

226075954