UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
: 
AMERICAN SOCIETY FOR THE :
PREVENTION OF CRUELTY TO ANIMALS, :
:
Plaintiff, :
:
v. : Civil Action No. 1:19-cv-3112-NRB
:
THE ANIMAL AND PLANT HEALTH :
INSPECTION SERVICE, and : **Statement of Material Facts**
THE UNITED STATES DEPARTMENT :
OF AGRICULTURE, :
:
Defendants. :
:
--------------------------------------- X

Plaintiff, the American Society for the Prevention of Cruelty to Animals ("ASPCA"), pursuant to Local Rule 56.1, hereby respectfully submits this Statement of Material Facts in support of the accompanying Memorandum of Law in Opposition to the Defendants' the Animal and Plant Health Inspection Service ("APHIS") and the United States Department of Agriculture ("USDA") (together, "Defendants") Motion for Summary Judgment on Plaintiff's FOIA Requests and for Judgment on the Pleadings, or in the Alternative, Summary Judgment, Regarding Plaintiff's Pattern or Practice Claim ("Defendants' Motion") and Plaintiff's Cross-Motion for Summary Judgment ("Plaintiff's Cross-Motion"). The following material facts are undisputed, cite to admissible evidence establishing each, and support entry of judgment in Plaintiff's favor. Defendants did not file a statement of facts with Defendants' Motion, and therefore no response to Defendants' statement is included herein.

### *The ASPCA is a Non-Profit Focused on Preventing Animal Cruelty*

1. Plaintiff ASPCA is a not-for-profit corporation that the New York State legislature incorporated in 1866 by a special act. Declaration of Robert Hensley, Jr. ("Hensley Decl.") ¶ 3.

2. The ASPCA's mission is to provide an effective means for the prevention of cruelty to animals throughout the United States. *Id*.

3. It is North America's oldest humane organization, and one of the largest in existence today, with roughly 3 million supporters nationwide. *Id.*

### *APHIS & USDA are Charged with Administering the Animal Welfare Act*

4. Defendants administer the Animal Welfare Act ("AWA"), with the stated policy objective of ensuring "that animals intended for use in research facilities or for exhibition purposes or for use as pets are provided humane care and treatment[.]" 7 U.S.C. § 2131(1); 9 C.F.R. §§ 1.1, *et seq*.

5. Defendants are charged with "mak[ing] such investigations or inspections" as "necessary to determine whether any [*inter alia*] dealer, exhibitor, [or] research facility … has violated or is violating any provision of this chapter or any regulation or standard issued thereunder, and for such purposes, the [Defendants] shall, at all reasonable times, have access to the places of business and the facilities, animals, and those records required to be kept …." *Id*. § 2146(a).

6. Regulated entities and persons under the AWA are subject to inspection by Defendants, including prior to receiving a license and unannounced compliance inspections. 9 C.F.R. § 2.3.

7. Licensees must submit an annual Application for License (APHIS Form 7003), which discloses, *inter alia*, the total number of animals purchased, sold, gross amount derived

from all sales, and the amount of fees paid in the last year ("Block 10 Information"). 9 C.F.R. § 2.1(d)(1); *see also, e.g.*, Hensley Decl., Ex. 1.

### *Defendants Have a History of Poor AWA Administration & Enforcement*

8. Defendants' enforcement of the AWA has been the subject of much consternation, including by the USDA's own Office of the Inspector General ("OIG"). The OIG has issued a number of reports finding Defendants' activities woefully deficient. *See, e.g.*, Hensley Decl. ¶ 6 (and sources cited therein).

### *Until 2017, Defendants Posted Inspection Records Online for the Public and Admitted the Information in the Records are not Confidential*

9. As early as 2009, the Agencies provided access to records of inspections of AWA-licensed facilities and enforcement actions taken by Defendants against licensees for AWA violations online, including through databases maintained by Defendants on their website ("Databases"). Hensley Decl., Ex. 2 at 11.

10. In June 2009, Administrator Kevin Shea described facility inspection reports as "the most frequently requested APHIS records under the FOIA." Hensley Decl., Ex. 3.

11. In the year after the Agencies provided online access to inspection records, APHIS' FOIA requests dropped by nearly 35%. Hensley Decl., Ex. 2 at 11.

12. The ASPCA relied on the Databases to access and review inspection records to make sure the Agencies are administering and enforcing the AWA and to carry out its crucial mission of preventing cruelty to animals. Hensley Decl. ¶ 9.

13. Prior to 2017, licensee names, business addresses, license numbers, and other information, including microchip numbers, appearing in inspection reports posted on the Databases were all released unredacted. Hensley Decl. ¶ 10.

14. In 2012, the Agencies explained to the U.S. District Court for the District of Columbia that Block 10 Information was not confidential because licensee inspection reports, the amount licensees pay in fees, and the size of their inventory, are publicly available. *Jurewicz v. USDA*, 891 F. Supp. 2d 147, 150-151, 154 (D.D.C. 2012), *aff'd*, 741 F.3d 1326 (D.C. Cir. 2014).

15. The *Jurewicz* court partially relied on a letter memorandum written by Tonya Woods, the FOIA and Privacy Acts Director for APHIS, to rule Block 10 Information was not confidential. *Id.*; Hensley Decl., Ex. 4.

### *The Agencies Abruptly Adopt Unlawful Policies and Practices*

16. On or about February 2, 2017, Defendants abruptly blocked public access to the Databases, with the stated justification of furthering their "commit[ment] to being transparent." Hensley Decl., Ex. 5.

17. The blackout undermined state and local regulatory structures that were premised on the availability of these records and deprived the public, policy-makers, and law enforcement of vital information about the commercial breeding industry and the Agencies' enforcement of the AWA. Hensley Decl. ¶ 14.

18. Defendants directed the public to submit individual FOIA requests for the information previously available online. Hensley Decl., Ex. 5.

19. Predictably, FOIA requests increased by more than 50% in 2017. Woods PP Decl. ¶¶ 14-15.

20. At the same time, the Agencies *slowed* their response to FOIA requests, processing over 200 fewer requests in FY 2017 than they did in FY 2016. *Id.*, ¶ 14.

21. Defendants' backlog of FOIA requests now numbers in the thousands. *Id.*; *see also* Hensley Decl., Ex. 6; Hensley Decl., Ex. 7, at p. 14.

22. Defendants' backlog increased over 12% between 2018 and 2019. Hensley Decl., Ex. 7, at p. 14.

23. Defendants processed 26% fewer FOIA requests in 2019 than they did in 2018. *Id.*

24. In the midst of these failures, the Agencies have *eliminated* monthly reporting requirements for FOIA units, previously a part of their backlog reduction plan, including the requirement to confirm that program offices are timely returning records. *See id.*, at p. 16; *see also* Hensley Decl., Ex. 8.

25. Congress expressly disapproved of the Agencies' unilateral decision to take down the Databases, and directed that the Agencies:

> restore all legally permissible records previously removed, and resume posting on the USDA website. The online searchable database should allow analysis and comparison of data and include all inspection reports, annual reports, and other documents related to enforcement of the HPA and the AWA.

H. Rept. 115-232 to H.R. 3268 (Jul. 17, 2017).

26. The Agencies failed to repost many records that were previously available in the Databases, and redacted much of the previously-public information it did post. Woods PP Decl. ¶ 13.

27. In December 2019, Congress passed legislation requiring the Agencies to restore all the records previously available on the Databases and make certain records publicly available without redactions except signatures, including inspection reports and enforcement records. *Id.*, ¶ 34.

### The Agencies Engage in a Practice of Failing to Timely Respond to all FOIA Requests

28. APHIS failed to issue a determination within FOIA's 20-day period statutory deadline for 1,080 out of 1,233 simple requests, or 87% percent of the time, in FY 2018. Hensley Decl., Ex. 9, at p. 32.

29. Of the simple FOIA requests APHIS responded to in FY 2018, 824 out of 1,233, or 66% of them, took over 100 days to close. *Id.*

30. In FY 2019, APHIS responded late to 884 out of 1,065 simple requests, or 83% of the time. *See* Hensley Decl., Ex. 10, at p. 25.

31. Several FOIA requests dragged on for years, including requests that took the Agencies 819 days, 864 days, and 893 days to close. Woods PP Decl. ¶ 32; Woods SJ Decl. ¶¶ 26-28, 36-38.

### *The Agencies Delay ASPCA's FOIA Requests Even More Than Other FOIA Requests*

32. In the period encompassed by the Amended Complaint, the Agencies failed to issue timely responses to 72 of 76, or **95% or requests** submitted by the ASPCA. Woods PP Decl. ¶ 32.

33. On average, APHIS responds to the ASPCA's FOIA requests in 224 days. Woods PP Decl. ¶¶ 32-33

34. APHIS's average response time for similar requests is 200 days. *Id.*

35. APHIS has never notified the ASPCA that any of the ASPCA's FOIA requests at issue in this litigation have been designated "complex." Hensley Decl. ¶ 22.

36. Defendants' practice of unlawful delay continues, as on May 7, 2020 the ASPCA was forced to inquire regarding the status of 21 of its FOIA requests, submitted to the Agencies after this lawsuit was filed, all of which had exceeded the 20 day deadline for a response. Hensley Decl. ¶ 26, Ex. 11.

37. APHIS responded, and stated that, of those 21 requests, only seven had been completed, and six of those seven were completed after receiving the ASPCA's May 7 letter. *See* Hensley Decl., Ex. 12.

### *The Agencies Unlawfully Redacted and Withheld Non-Exempt Information From FOIA Requests Despite Disclosing the Same Information to a Licensee*

38. After APHIS blocked public access to the Databases, it began redacting identifying information from licensee records. Woods PP Decl. ¶ 13.

39. The Agencies even redacted the date of inspection so the public could not match licensees to the redacted inspection reports that the Agencies had reposted to the Database. *See* Decl. of Tonya Woods, *HSUS v. APHIS*, 1:18-cv-00646 (TNM), Dkt. 18-2, ¶¶ 63, 63 (D.D.C., Sept. 7, 2018).

40. This policy of concealment was ruled unlawful in *HSUS v. APHIS*. *See* Woods SJ Decl. ¶ 22 (citing *HSUS v. APHIS*, 386 F. Supp. 3d 34 (D.D.C. 2019)).

41. While they were withholding dates of inspection from animal welfare organizations and the public, the Agencies released the same type of information to a licensee in one business day without a FOIA request. Hensley Decl., Ex. 13.

### *The Agencies Inappropriately Redacted Information About Classy, Sobrad, and Other Licensees*

42. In May 2017, the ASPCA requested "inspection reports and photographs . . . for all dog breeders and dog dealers" from March 2017. Woods SJ Decl. ¶ 41.

43. APHIS assigned tracking number 2017-APHIS-03967 to this request, and ultimately released 741 pages in full and 48 pages with redactions. Woods SJ Decl. ¶¶ 41-46.

44. One photograph is illegible, and large portions of the exhibit are redacted purportedly pursuant to 5 U.S.C. § 552(b)(4) ("Exemption 4"). Hensley Decl., Ex. 14; Woods SJ Decl. ¶ 177.

45. In April, 2018, the ASPCA requested records related to licensee Sobrad LLC ("Sobrad"). Woods SJ Decl. ¶ 88 (incorrectly stating date of request was November 13, 2017); Woods Decl., Exhibit 14 (ASPCA request, dated April 13, 2018).

46. APHIS assigned the request tracking number 2018-APHIS-03517-F, and ultimately released 67 pages in full and 24 pages with redactions, including Hensley Decl., Ex. 1. Woods Decl. ¶¶ 88-92; Henley Decl. ¶ 5.

47. APHIS produced an Application for License (APHIS Form 7003) submitted by Sobrad, and it redacted Block 10 Information purportedly under Exemption 4. *E.g.*, Hensley Decl., Ex. 1; Woods Decl. ¶ 176.

48. In July, 2018, the ASPCA requested "license renewal forms" for Sobrad for 2016-2018. Woods Decl. ¶ 101.

49. APHIS assigned the request tracking number 2018-APHIS-04902-F, and ultimately released three pages in full and three pages with redactions. Woods Decl. ¶¶ 101-105; Hensley Decl., Ex. 15.

50. Exhibit 15 contains multiple Application for License forms (APHIS Form 7003) submitted by Sobrad, and they redact Block 10 Information purportedly under Exemption 4. Hensley Decl., Ex. 15; Woods Decl. ¶ 176.

51. In December 2018, the ASPCA requested documents related to licensee Classy Creations ("Classy") from 2015 and later, including "license applications." Woods Decl. ¶ 116.

52. APHIS assigned the request tracking number 2019-APHIS-01263-F, and ultimately released 161 pages in full and 10 pages with redactions. Woods Decl. ¶¶ 116-123; Henley Decl., Ex. 16.

53. Exhibit 16 contains Application for License forms (APHIS Form 7003) submitted by Classy, with Block 10 information and fee information redacted purportedly under Exemption 4. Hensley Decl., Ex. 16; Woods Decl. ¶ 176.

*Ruby Fur Farm*

54. Between June 12, 2017 and July 25, 2017, APHIS officials visited Ruby Fur Farm at least five times and documented the conditions in the raccoon breeding facility. Hensley Decl., Ex. 17.

55. APHIS officials recorded temperatures that ranged from 90 to 101 degrees Fahrenheit, and heat indexes of 101 to 123 degrees. *Id.*

56. APHIS officials observed animals who were panting; exhibiting severely increased respiratory rates; breathing with their mouths open; drooling; laying on their sides, backs and abdomens with their legs splayed; and appearing lethargic. *Id.*

57. On July 21, 2017, the Agency issued a confiscation notice to Ruby Fur Farm for twenty-six raccoons "exhibiting signs of severe heat distress," and confiscated ten of those raccoons immediately. *See* Hensley Decl., Ex. 18.

58. On July 22, 2017 and July 23, 2017, Agency officials made plans to remove the remaining raccoons from Ruby Fur Farm subject to the confiscation notice. Hensley Decl., Ex. 19.

59. On July 24, 2017, the APHIS Deputy Administrator and a Senior White House Advisor in the Office of the Secretary received an e-mail from The Cavalry Group questioning the legitimacy of the Agency's actions concerning Ruby Fur Farm, stating that Ruby Fur Farm had legal representation, and demanding that the Agency immediately halt the confiscation of animals from Ruby Fur Farm. Hensley Decl., Ex. 20.

60. On July 24, 2017, the APHIS Deputy Administrator sent an e-mail to The Cavalry Group in response stating that she would instruct her team to "pause additional activity at the facility" pending review of the matter. *Id.*

61. The communications between APHIS, the Office of General Counsel ("OGC"), and the Office of the Secretary ("OSEC") in the hours and days immediately following The Cavalry Group's July 24, 2017 e-mail and the Deputy Administrator's "pause" in activities are heavily redacted. *See* Hensley Decl., Exs. 21-25.

62. On July 25, 2017, Agency officials returned to Ruby Fur Farm for a focused inspection and documented that the inability of the raccoons to "cool off has caused them to suffer" and that "[t]he high temperature and humidity is having a negative impact on the health and well-being of the animals." Hensley Decl., Ex. 26.

63. Despite these egregious conditions, Agency officials did not confiscate any additional animals from Ruby Fur Farm "[d]ue to circumstances that were out of the control of the inspectors." Hensley Decl., Ex. 17.

64. On July 26, 2017, the ten animals originally confiscated from Ruby Fur Farm on July 21, 2017 were returned to the facility and the Agency constructively rescinded its confiscation notice. Hensley Decl., Ex. 18.

Dated: New York, New York
       May 18, 2020

                 Respectfully Submitted,

                 COOLEY LLP

                 */s/ Erin M. Estevez*
                 Erin M. Estevez (*admitted pro hac vice*)
                 Bonnie Weiss McLeod (*admitted pro hac vice*)
                 1299 Pennsylvania Ave.
                 Suite 700
                 Washington, D.C. 20004
                 Phone: (202) 728-7065
                 Fax: (202) 842-7899
                 eestevez@cooley.com
                 bweissmcleod@cooley.com

        Kaitland M. Kennelly (KK-9574)
55 Hudson Yards
New York, New York 10001-2157
Phone: (212) 479-6643
Fax: (212) 479-6275
kkennelly@cooley.com

and

Jennifer H. Chin (JC-6317)
Robert G. Hensley (*admitted pro hac vice*)
Tamara Y. Feliciano (*admitted pro hac vice*)
ASPCA
520 8th Avenue, 7th Floor
New York, New York 10018
Phone: (212) 876-7700
jennifer.chin@aspca.org
robert.hensley@aspca.org
tamara.feliciano@aspca.org

*Attorneys for Plaintiff*

226090177