**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------X
AMERICAN SOCIETY FOR THE PREVENTION OF
CRUELTY TO ANIMALS,

                    Plaintiff,

                                                    **MEMORANDUM AND ORDER**

          - against -

                                                     19 Civ. 3112 (NRB)

THE ANIMAL AND PLANT HEALTH INSPECTION
SERVICE and THE UNITED STATES DEPARTMENT
OF AGRICULTURE,

                    Defendants.
---------------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


     The American Society for the Prevention of Cruelty to

Animals ("ASPCA") brought this case under the Freedom of

Information Act, 5 U.S.C. § 552 ("FOIA"), against the United

States Department of Agriculture ("USDA") and its constituent

agency the Animal and Plant Health Inspection Service

("APHIS" and together with USDA, the "Agencies").

     This case presents three broad issues.  First, the APSCA

challenges the Agencies' redactions of certain information

under FOIA Exemption 4, which protects confidential business

information.  Next, the ASPCA contends that the Agencies

improperly withheld information under FOIA Exemption 5, which

shields privileged information from disclosure.  Finally, the

ASPCA charges that the Agencies have adopted a policy and

practice of violating the FOIA that requires the Court's intervention.

The parties cross-move for summary judgment on the Agencies' application of Exemptions 4 and 5. (ECF Nos. 42, 49.) The Agencies move for judgment on the pleadings on the ASPCA's policy and practice claim (ECF No. 42) and the parties also cross-move for summary judgment on that claim (ECF Nos. 42, 49). For the reasons discussed below, the Court grants in part and denies in part the parties' cross-motions for summary judgment on the Agencies' assertions of the FOIA exemptions and grants the Agencies' motion for judgment on the pleadings on the ASPCA's policy and practice claim.

**BACKGROUND**

### A.   The Freedom of Information Act

The FOIA requires that federal agencies make their records "promptly available to any person" upon request. 5 U.S.C. § 552(a)(3)(A). This mandatory disclosure regime is limited by nine statutory exemptions. Id. § 552(b). Moreover, even when information falls under one or more of those exemptions, agencies may withhold that information only if "the agency reasonably foresees that disclosure would harm an interest protected by [the] exemption" or if "disclosure is prohibited by law." Id. § 552(a)(8)(A).

Upon receiving a request for information, agencies have 20 business days to determine whether to comply with such requests and to notify the requester of its determination. Id. § 552(a)(6)(A)(i).

Finally, the FOIA provides a private right of action that permits requesters to challenge whether an agency has improperly withheld information that must be disclosed.  Id. § 552(a)(4)(B).

### B.   Factual Background

The ASPCA is a non-profit organization whose mission is to "provide an effective means for the prevention of cruelty to animals throughout the United States."  (Pl.'s Statement of Material Facts and Defs.' Response (ECF No. 56) ("SOMF") ¶¶ 1-2.)  To further its organizational goals, the ASPCA monitors enforcement of federal animal welfare laws, including by submitting FOIA requests to federal agencies. (See id. ¶ 12; Decl. of Tonya Woods Regarding Pl.'s Policy & Practice Allegations (ECF No. 45) ("Woods P&P Decl.") ¶ 32 n.1.)

As relevant to this lawsuit, the ASPCA submitted 76 FOIA requests to the Agencies between February 2016 and January 2019.  (SOMF ¶ 32.)  These requests sought information related to the Agencies' administration and enforcement of the Animal Welfare Act, 7 U.S.C. §§ 2131 et seq. ("AWA"), which is the

primary federal statute governing the humane treatment of animals by commercial entities, such as dealers and breeders.

1.    **The Agencies' Application of FOIA Exemptions 4 and 5[1]**

One type of record that the ASPCA repeatedly requested was annual license renewal applications submitted to APHIS by animal dealers, known as Form 7003.  When producing these records to the ASPCA, the Agencies invoked FOIA Exemption 4 to redact information submitted by the dealers regarding their revenue, the number of animals they sold, and their annual license fee, which is calculated based on a dealer's revenue.  (Woods Decl. ¶¶ 174-76.)

Additionally, in response to the ASPCA's request for APHIS inspection reports, the Agencies redacted under Exemption 4 a photograph from an inspection that would reveal an APHIS licensee's proprietary animal care instructions. (Id. ¶ 177.)

Finally, the ASPCA submitted a request for records concerning the Agencies' 2017 inspections of and enforcement actions taken against Ruby Fur Farm, which is discussed in more detail below.  (Id. ¶ 57.)  In response to this request,

---

[1]    The facts summarized in this section are derived from the ASPCA's Statement of Material Facts and the Agencies' corresponding response (ECF No. 56), the declaration of Tonya Woods and its attachments (ECF No. 44), and the declaration of Robert G. Hensley, Jr. and its attachments (ECF No. 51).

the Agencies withheld or redacted information from several records under Exemption 5 that the Agencies assert is protected by either the attorney-client privilege or the deliberative process privilege. (Id. ¶¶ 178-81.)

The ASPCA asserts that the Agencies unlawfully withheld the redacted information in these three categories of records.

### 2. The Timeliness and Adequacy of the Agencies Responses to the ASPCA's FOIA Requests[2]

The ASPCA alleges that the Agencies have adopted a policy and practice of violating the FOIA's processing and production requirements.

The Amended Complaint catalogues the following requests to which the Agencies did not timely respond. Between February 2016 and January 2017, the ASPCA submitted five FOIA requests that the Agencies did not respond to in a timely manner. (Am. Compl. ¶¶ 50-54.) However, from February 2017 through April 2019, the Agencies failed to timely respond to 30 of the ASCPA's FOIA requests. (Id. ¶¶ 55-84.) And, prior to the ASPCA filing this lawsuit, the Agencies had not produced responsive records for at least 20 of those requests. (Id. ¶¶ 56-57, 60, 63-66, 68, 70, 72-75, 77-78, 80-84.)

---

[2]   The allegations summarized in this section are taken from the Amended Complaint (ECF No. 22).

Moreover, most of the ASPCA's requests submitted during this time period were similar and fairly straightforward, such as seeking inspection reports of dog breeders from the previous month (id. ¶¶ 55, 57, 60, 65, 70-71, 77-79, 82, 84), or recent AWA enforcement action records (id. ¶¶ 56, 58, 61, 63, 66, 69, 74, 76, 83).  In none of these cases did the Agencies seek an extension or otherwise attempt to reclassify the request to remove it from the FOIA's 20-day response window. (See id. ¶¶ 55-84.)

A notable uptick in the Agencies' noncompliance with the FOIA's processing and prompt production requirements coincided with the Agencies' decision on February 3, 2017 to decommission two databases that allowed members of the public to search and access inspection and enforcement records related to APHIS licensees.  (See id. ¶¶ 35-36, 41, 46-47; compare id. ¶¶ 50-54, with id. ¶¶ 55-84.)  These databases had been established in 2009 to alleviate the Agencies' FOIA burdens by making publicly available some of their most frequently requested records.  (Id. ¶ 37.)  Publishing these databases reduced the volume of APHIS's FOIA request by 35% within a year.  (Id.)  The ASPCA was one of the entities that regularly relied on these databases to obtain records in lieu of submitting FOIA requests.  (See id. ¶¶ 35, 40.)

After taking down the databases, the Agencies directed members of the public to request the records under the FOIA instead.  (Id. ¶ 46.)  As a result, the Agencies experienced a significant increase in FOIA requests and were unable to process incoming requests at the same rate.  (See id. ¶¶ 47-48.)  By the end of 2018, the Agencies had a backlog of over 1,000 FOIA requests that they had not yet processed within the FOIA's statutory window.  (Id. ¶ 48.)

In addition to these processing failures, the Agencies also began redacting information from the records that had previously been publicly available on the databases.  (See id. ¶ 45.)

## LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment is the preferred vehicle for resolving disputes over an agency's application of a FOIA exemption. See Seife v. U.S. Dep't of State, 298 F. Supp. 3d 592, 604 (S.D.N.Y. 2018) (citation omitted).  As with all motions for summary judgment, courts will not grant the requested relief unless the parties' submissions, viewed together, establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

Courts review <u>de novo</u> whether a FOIA exemption applies, 5 U.S.C. § 552(a)(4)(B), and resolve "all doubts as to the applicability of the exemption . . . in favor of disclosure." <u>N.Y. Times Co. v. U.S. Dep't of Justice</u>, 756 F.3d 100, 112 (2d Cir. 2014) (citation omitted).  This means that "the agency's decision that the information is exempt from disclosure receives no deference." <u>Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.</u>, 601 F.3d 143, 147 (2d Cir. 2010) (citations omitted).  Instead, the FOIA places the burden on the defending agency to justify its decision to withhold information under a FOIA exemption.  5 U.S.C. § 552(a)(4)(B).

For an agency to carry this burden, it must demonstrate "that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from [the FOIA's] inspection requirements." <u>Ruotolo v. Dep't of Justice, Tax Div.</u>, 53 F.3d 4, 9 (2d Cir. 1995) (citation omitted).  An agency may fulfill this requirement by submitting declarations that "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record [or] by evidence of agency bad faith." <u>Wilner v. Nat'l Sec. Agency</u>, 592 F.3d 60,

73 (2d Cir. 2009) (citation omitted). These agency
submissions are "accorded a presumption of good faith," and
thus "an agency's justification for invoking a FOIA exemption
is sufficient if it appears logical or plausible." Id. at
69, 73 (citations omitted).

On the other hand, "[s]ummary judgment in favor of the
FOIA plaintiff is appropriate when an agency seeks to protect
material which, even on the agency's version of the facts,
falls outside the proffered exemption." New York Times Co.
v. U.S. Dep't of Def., 499 F. Supp. 2d 501, 509 (S.D.N.Y.
2007) (citation and internal quotation marks omitted).

**B.   Motion for Judgment on the Pleadings**

On a motion for judgment on the pleadings under Fed. R.
Civ. P. 12(c), the Court applies the same standard as a motion
to dismiss for failure to state a claim upon which relief can
be granted. Bank of New York v. First Millennium, Inc., 607
F.3d 905, 922 (2d Cir. 2010); see Judicial Watch, Inc. v.
United States Dep't of Homeland Sec., 895 F.3d 770, 777 (D.C.
Cir. 2018) (applying this standard to a motion for judgment
on the pleadings for a FOIA policy and practice claim). That
is, the Court must determine whether the Amended Complaint
contains "sufficient factual matter, accepted as true, to
state a claim to relief that is plausible on its face" after

drawing all reasonable inferences in favor of the ASPCA.  Bank
of New York, 607 F.3d at 922 (citation omitted).

## DISCUSSION

## I.  The Agencies' Application of FOIA Exemption 4

FOIA Exemption 4 protects "matters that are . . . trade
secrets and commercial or financial information obtained from
a person and privileged or confidential."  5 U.S.C. §
552(b)(4).  A document may be withheld under Exemption 4 when
"a tripartite test is satisfied: (1) the information for which
exemption is sought must be a trade secret or commercial or
financial in character; (2) it must be obtained from a person;
and (3) it must be privileged or confidential."  Bloomberg,
601 F.3d at 147 (citation and emphasis omitted).  Here, the
parties do not dispute the first and second prongs, and so
the only issue is whether the information is confidential.

In Food Marketing Institute v. Argus Leader Media, the
Supreme Court recently announced a two-factor test to
determine whether information is "confidential" for purposes
of Exemption 4.  139 S. Ct. 2356 (2019).  First, the agency
must demonstrate that the redacted information is
"customarily and actually treated as private by its owner."
Id. at 2366.  This condition is necessary.  Id. at 2363.
Second, the Supreme Court instructed courts to consider
whether the information was "provided to the government under

an assurance of privacy," and suggested that information might "lose its confidential character for purposes of Exemption 4 if it's communicated to the government without assurances that the government will keep it private." Id. at 2363, 2366.  While the Supreme Court stopped short of holding that this second condition was also necessary, it found that it had nevertheless been satisfied in Argus Leader.  Id.

### A.   Form 7003 Block 10 Information

The ASPCA first challenges the Agencies' redactions of revenue and sales volume information on the Form 7003 annual license renewal applications, known as "Block 10" information based on where it is entered on Form 7003.  The Form 7003s at issue here were all submitted by dealers to APHIS between March 2015 and April 2018.  (See Decl. of Robert G. Hensley, Jr. (ECF No. 51) ("Hensley Decl.") Exs. 1, 15, 16.)

The Agencies satisfy the Argus Leader's first requirement to demonstrate that the dealers submitting the Form 7003s at issue actually and customarily treated the Block 10 information as private.  As reflected in the Agencies' declaration, the Agencies contacted the dealers to discuss how they treated the Block 10 information and then determined that the Block 10 information was "customarily" treated as "confidential" by the dealers and "not ordinarily or actually released to the public."  (Woods Decl. ¶¶ 175-76.)  As the

Agencies' declaration is entitled to a presumption of good faith and because the ASPCA does not submit any contrary evidence, there is no genuine dispute over this prong of the Argus Leader test.

With respect to Argus Leader's second condition regarding government assurances of confidentiality, the Agencies offer no evidence that they provided any such assurances.  Instead, they argue that "there is no need or basis to require that both [of the Argus Leader] conditions be met" for Exemption 4 to apply.  (Defs.' Mem. in Opp. (ECF No. 54) at 13-14 (citation and quotation marks omitted).)

While the Supreme Court in Argus Leader did not resolve the issue of whether government assurances are necessary to satisfy Exemption 4, such assurances are indisputably relevant to the Exemption 4 analysis.  See Stotter v. United States Agency for Int'l Dev., No. 14 Civ. 2156, 2020 WL 5878033, at *5 (D.D.C. Oct. 3, 2020) ("[I]t is clear beyond cavil that whether the agency provided an assurance of privacy when it receive[d] the information is relevant to determining whether financial information that is shared with the government is confidential pursuant to the FOIA's Exemption 4.") (citation and internal quotation marks omitted); Shapiro v. Dep't of Justice, No. 12 Civ. 313, 2020 WL 3615511, at *26 (D.D.C. July 2, 2020) ("[W]hether the agency provided an

assurance of privacy is undoubtedly relevant to determining whether commercial information possessed by [a federal agency] is confidential.") (citations and internal quotation marks omitted); accord WP Co. LLC v. U.S. Small Bus. Admin., No. 20 Civ. 1240, 2020 WL 6504534, at *9 (D.D.C. Nov. 5, 2020) (citations omitted).

Here, though, the Court need not decide whether government assurances of confidentiality are required. That is because, at the time the dealers submitted the Form 7003s in question, the Agencies took the public position that they would not treat Block 10 information as confidential. In 2012, in a reverse-FOIA action, a group of dealers sued the USDA to prevent it from releasing Block 10 information in response to FOIA requests, claiming that they were protected by Exemption 4. Jurewicz v. U.S. Dep't of Agric., 891 F. Supp. 2d 147 (D.D.C. 2012), aff'd, 741 F.3d 1326 (D.C. Cir. 2014). The USDA defended its position that Exemption 4 did not cover the Block 10 information, arguing that "similar information was already in the public domain." Id. at 154–55. The district court found that the USDA's determination that Exemption 4 did not apply was not arbitrary and capricious, and therefore upheld the USDA's decision to release the Block 10 information. Id. On appeal, the D.C. Circuit affirmed. Jurewicz v. U.S. Dep't of Agric., 741 F.3d

1326 (D.C. Cir. 2014).  Thus, while <u>Jurewicz</u> applied an
Exemption 4 standard that the Supreme Court later rejected in
2019 in <u>Argus Leader</u>, it remained good law from 2012 through
2019.

Therefore, when the dealers submitted the Block 10
information at issue to the Agencies between 2013 and 2018,
they were on notice that it was the Agencies' policy to
release that information in response to a FOIA request.  In
other words, the dealers had no reasonable expectation that
the Agencies would treat the information as confidential.

Even if government silence might fall in a gray zone, it
still stands to reason that if government assurances of
privacy convey confidentiality for purposes of Exemption 4,
then government assurances of publicity vitiate the same.
The Court therefore joins the growing chorus of opinions
reasoning that Exemption 4 does not apply when an agency
publicly acknowledges that it will not treat information as
confidential,[3] a conclusion that is even endorsed by the

---

[3]    <u>WP Co. LLC</u>, 2020 WL 6504534, at *9 (casting doubt that
information "could remain 'confidential' for purposes of Exemption 4 when
the Government not only provided no assurance of privacy, but also told
[submitters] explicitly that the information would be disclosed"); <u>Ctr.
for Investigative Reporting v. United States Dep't of Labor</u>, 470 F. Supp.
3d 1096, 1114 (N.D. Cal. 2020) ("[W]hile it is uncertain whether an
assurance of privacy is required, where, as here [the agency] indicated
the opposite – that it would disclose the [information submitted] –
[submitter] lost any claim of confidentiality it may have had."); <u>Ctr.
for Investigative Reporting v. Dep't of Labor</u>, No. 18 Civ. 2414, 2020 WL
2995209, at *5 (N.D. Cal. June 4, 2020) (finding that an agency's
"statement about its intent to post the information online is dispositive

Department of Justice's official guidance on Exemption 4 in the wake of Argus Leader.[4]

B.   Form 7003 Fee Information

The Court reaches the same result for the annual license fee information reflected on the Form 7003s at issue, which is entirely derived from the Block 10 information.

First, as the Block 10 information on these Form 7003s is itself not protected, the dealers can have no confidentiality interest in the annual license fee amount that was calculated by simply inputting the Block 10

---

of the question of confidentiality" because "information loses its character of confidentiality where there is express agency notification that submitted information will be publicly disclosed") (emphasis in original).

[4]   Exemption 4 after the Supreme Court's Ruling in Food Marketing Institute v. Argus Leader Media, U.S. Dep't of Justice, Office of Info. Policy (Oct. 4, 2019), https://www.justice.gov/oip/exemption-4-after-supreme-courts-ruling-food-marketing-institute-v-argus-leader-media (noting that when a submitter is on notice of an "agency's intention to publicly disseminate the information," then "the information . . . would be deemed to have lost its 'confidential' character under Exemption 4 upon its submission to the government, given that the submitter was on notice that it would be disclosed") (emphasis in original); id. (suggesting that even when an agency does not expressly state it will release the submitted information, "absent an express assurance [of confidentiality] by the agency, a submitter would not normally have a reasonable expectation of confidentiality for records the agency has historically disclosed"); Step-by-Step Guide for Determining if Commercial or Financial Information Obtained from a Person is Confidential Under Exemption 4 of the FOIA, U.S. Dep't of Justice, Office of Info. Policy (Oct. 7, 2019), https://www.justice.gov/oip/step-step-guide-determining-if-commercial-or-financial-information-obtained-person-confidential (offering guidance that when there are "express or implied indications at the time the information was submitted that the government would publicly disclose the information," and if "no other sufficient countervailing factors exist," then "the submitter could not reasonably expect confidentiality upon submission and so the information is not confidential under Exemption 4") (emphasis in original).

information into a statutory formula.  See 9 C.F.R. §§
2.1(d)(1), 2.6(b)-(c) (2018).

Second, and equally important, the USDA represented in
Jurewicz that it was agency policy to "routinely release[]
the amount of fees paid in response to FOIA requests."  891
F. Supp. 2d at 155.  As with the Block 10 information, the
Agencies' public position at the time the Form 7003s in
question were submitted that they would release the fee
information prevents that information from being considered
"confidential" for purposes of Exemption 4.

C.   **Animal Care Instructions**

The final Exemption 4 redactions that the ASPCA
challenges are those the Agencies applied to an APHIS
inspection report photograph of written instructions from a
licensee about how it "operates to ensure the proper care of
animals," which the Agencies characterize as "proprietary"
information.  (Woods Decl. ¶ 177; id. Ex. 29 ("Categorical
Vaughn Index") at 1.)

For this information, the Agencies do not even satisfy
Argus Leader's first and necessary condition of establishing
that it is "both customarily and actually treated as private
by its owner."  139 S. Ct. at 2366.

Discerning whether an agency has satisfied Argus
Leader's first prong is an "objective" inquiry under which

"the agency invoking Exemption 4 must meet the burden of proving the [submitter's] custom." Seife v. Food & Drug Admin., __ F. Supp. 3d __, No. 17 Civ. 3960 (JMF), 2020 WL 5913525, at *4 (S.D.N.Y. Oct. 6, 2020) (quoting Ctr. for Investigative Reporting v. U.S. Customs & Border Prot., 436 F. Supp. 3d 90, 110 (D.D.C. 2019)).

Here, unlike with the dealers who furnished the Form 7003 information discussed above, the Agencies submit no proof that they contacted the licensee to determine whether it customarily and actually treats the broker instructions at issue as confidential.  (Cf. Woods Decl. ¶ 175.)  Instead, the Agencies assert in conclusory fashion that they "determined the broker's instructions [are] considered confidential and would qualify as private" without presenting any evidence of the licensee's actual custom. (Categorical Vaughn Index at 1.)  The Court, of course, affords no deference to the Agencies' legal conclusion that the underlying information is confidential when the declaration is shorn of any evidence that would support that assertion. See Bloomberg, 601 F.3d at 147 (An "agency's decision that the information is exempt from disclosure receives no deference.") (citations omitted).

Because the Agencies offer no proof establishing that this particular licensee customarily and actually treats the

information as private, as is required under <u>Argus Leader</u>, the Agencies fail to establish objective facts that "demonstrate that the information withheld logically falls within the claimed exemption." <u>Wilner</u>, 592 F.3d at 73 (citation omitted). Accordingly, the Agencies do not justify withholding the information from the inspection photograph.

## II.   **The Agencies' Application of FOIA Exemption 5**

FOIA Exemption 5 protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). These protections extend to "agency documents that would be privileged in ordinary civil discovery," such as by application of the attorney-client privilege or the deliberative process privilege. <u>N.Y. Times Co. v. U.S. Dep't of Justice</u>, 939 F.3d 479, 488-89 (2d Cir. 2019) (citations omitted).

The ASPCA challenges the Agencies' application of Exemption 5 to redact information contained in four records concerning the Agencies' inspection of APHIS licensee Ruby Fur Farm and related enforcement actions.

Before analyzing the Agencies' invocation of the attorney-client and deliberative process privileges, it is useful to provide some background information about the Agencies' actions in regard to Ruby Fur Farm.

**A.    Factual Background of the Ruby Fur Farm Inspection and Enforcement Actions**

Between June 12, 2017 and July 25, 2017, a combination of USDA supervisors, inspectors, and veterinarians visited Ruby Fur Farm four times to monitor conditions at the facilities.  (SOMF ¶ 54; Hensley Decl. Ex. 17 at 2.)  During those visits, USDA employees recorded heat index temperatures at those facilities that reached over 120°F and were consistently over 110°F.  (Hensley Decl. Ex. 17 at 2.)  The employees also recognized that the animals living in those facilities were exhibiting severe signs of distress from the heat.  (Id.)  USDA eventually issued a confiscation order for 26 racoons and, on July 21, 2017, USDA employees removed ten of those racoons from Ruby Fur Farm with plans to take the remaining 16 early the following week.  (SOMF ¶ 57; Hensley Decl. Ex. 17 at 2; see id. Ex. 19 at 1.)

On July 24, 2017, the day that APHIS planned to confiscate the remaining animals, the president of The Cavalry Group, an organization that describes itself as "a private member-based company dedicated to protecting the constitutional and private property rights of law-abiding animal owners, animal-related businesses, and agricultural

concerns,"[5] emailed USDA Deputy Administrator Bernadette Juarez and Sam Clovis, a Senior White House Advisor in the Office of the USDA Secretary, about APHIS's actions at Ruby Fur Farm.   (SOMF ¶ 59; Hensley Decl. Ex. 20.)   The email accused USDA of an illegal taking of Ruby Fur Farm's property, informed the recipients that Ruby Fur Farm was represented by counsel, and threatened to sue USDA over the confiscation unless the USDA abandoned its confiscation plan and returned the racoons to Ruby Fur Farm.   (Hensley Decl. Ex. 20 at 2–4.)

Ms. Juarez capitulated and informed The Cavalry Group president that she "instructed [her] team to pause any additional activity," pending further review of the situation.   (Id. Ex. 20 at 2.)

Following the intervention from Ms. Juarez, on July 26, APHIS returned the 10 racoons that had been previously confiscated.   (Id. Ex. 18.)   Defendants do not dispute that these actions "constructively rescinded [the USDA's] confiscation notice."   (SOMF ¶ 64.)

The four records the ASPCA challenges related to these events are the following internal agency emails and their attachments:

---

[5]   The Cavalry Group (last visited Mar. 25, 2021), https://www.thecavalrygroup.com.

- (1) a July 25, 2017 email chain that included correspondence from Ms. Juarez to USDA staff and an attorney from USDA's Office of General Counsel that attached inspection reports and a draft memorandum concerning Ruby Fur Farm (Hensley Decl. Exs. 24, 25 (the "July 25 RFF Memo Email"));

- (2) an email chain from July 25, 2017 to July 26, 2017 between Ms. Juarez, Mr. Clovis, APHIS Administrator Kevin Shea, USDA staff, and an attorney from USDA's Office of General Counsel discussing updates to the Ruby Fur Farm situation (Hensley Decl. Ex. 22 (the "RFF Update Email Chain"));

- (3) a July 26, 2017 email from Ms. Juarez to her staff attaching a draft complaint and a memorandum about Ruby Fur Farm (Hensley Decl. Ex. 21 (the "July 26 RFF Email to Staff")); and

- (4) an email chain from July 24, 2017 to July 27, 2017 between Ms. Juarez, USDA staff, and an attorney from USDA's Office of General Counsel regarding the email sent by the president of The Cavalry Group (Hensley Decl. Ex. 23 (the "Cavalry Group Email Chain")).

To assist with its review, the Court conducted an in camera inspection of the disputed documents. See 5 U.S.C. § 552(b); ECF Nos. 60, 61.

### B. Analyzing the Agencies' Attorney-Client Privilege Claims

We start with the Agencies' attorney-client privilege redactions.

### 1. Legal Standards

The attorney-client privilege safeguards "confidential communications between client and counsel made for the purpose of obtaining or providing legal assistance." Am. Civil Liberties Union v. Nat'l Sec. Agency, 925 F.3d 576, 589 (2d Cir. 2019) ("ACLU") (citation omitted). It thus reaches

communications "(1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." Id. (citations omitted).

### 2.    RFF Email Update Chain Redactions

The ASPCA first challenges the Agencies' attorney-client privilege redactions to the RFF Email Update Chain.  (Hensley Decl. Ex. 22.)

The redacted information comes from an email sent from Ms. Juarez to several high-ranking USDA officials and a member of the USDA's Office of General Counsel.  After conducting an in camera review of the information in question, the Court has confirmed that the Agencies properly invoked the attorney-client privilege to protect information that explicitly discusses legal advice tendered by the Office of General Counsel.

### 3.    July 26 RFF Email to Staff Redactions

The ASPCA next contests the attorney-client privilege redactions that the Agencies applied to the July 26 RFF Email to Staff.  (Hensley Decl. Ex. 21.)

This email, which was sent by Ms. Juarez to her staff, relays legal advice provided by the Office of General Counsel and discusses draft legal documents that were being prepared with the help of the Office of General Counsel.  This

information is protected by the attorney-client privilege and is exclusively contained in the first two paragraphs of the July 26 RFF Email to Staff.  The remainder of the Agencies' redactions to this email are not attorney-client privileged.[6]

### 4.   Foreseeable Harm

Having found that the attorney-client privilege applies to aspects of these two records, the Court must still determine whether the Agencies have demonstrated that "disclosure would harm an interest protected by [the] exemption" before finding that they may withhold the privileged information.  5 U.S.C. § 552(a)(8)(A); see Nat. Res. Def. Council v. U.S. Env't Prot. Agency, No. 17 Civ. 5928 (JMF), 2019 WL 3338266, at *1 (S.D.N.Y. July 25, 2019) (noting that FOIA's foreseeable harm language "impose[s] an

---

[6]      The ASPCA also challenges whether the Agencies have adequately established that these communications remained confidential and thus retained their privileged status.  In support, the ASPCA points to records of communications with third parties and asserts that the declarant responsible for the Agencies' declaration lacked knowledge of the communications' confidential status.  First, none of the other records referenced by the ASPCA suggests that the contents of the legal advice protected by the privilege were in fact revealed to third parties. Second, the Woods Declaration affirms that the privileged communications were "confidential" (Woods Decl. ¶ 181), and states that the contents of the declaration were based on "consultations with APHIS personnel who are knowledgeable about the FOIA requests that are the subject of this litigation," as well as on the declarant's "own knowledge[] and/or on the basis of knowledge acquired by me through the performance of my official duties" (id. ¶ 3).  As the declaration is entitled to the presumption of good faith and because the declarant acknowledges that she supplemented her personal knowledge of the records at issue through appropriate outreach to persons at the Agencies with knowledge, the Court is satisfied that the Agencies have established that the information was kept confidential.

independent and meaningful burden on agencies") (citation omitted).  The purpose of the attorney-client privilege is to "encourage attorneys and their clients to communicate fully and frankly and thereby to promote broader public interests in the observance of law and administration of justice." ACLU, 925 F.3d at 589 (citations omitted).  And, in the context of government employees seeking legal advice from agency counsel, the privilege is designed to "further[] a culture in which consultation with government lawyers is accepted as a normal, desirable, and even indispensable part of conducting public business."  Id. (citation omitted).

Here, the Agencies assert that they applied Exemption 5 "to protect confidential communications between client and counsel (APHIS and OGC) made for the purpose of obtaining or providing legal advice" about the Ruby Fur Farm inspection and enforcement actions, that the protected information "encompasses descriptions of requests made to OGC and opinions given by OGC, as attorneys, based on client/APHIS supplied facts," and that disclosure of this information "would represent an intrusion into the attorney-client relationship, impeding the government's efforts to obtain and utilize full and frank legal advice to ensure its observance of the law."  (Woods Decl. ¶ 181; id. Ex. 30 ("RFF Vaughn Index") at 4, 6.)  Moreover, as the record reveals, these

communications occurred in the immediate wake of The Cavalry Group threatening litigation against the Agencies for the actions they took in confiscating animals from Ruby Fur Farm.

Based on this record, the Court is satisfied that disclosing the privileged information would harm the interests intended to be protected by the attorney-client privilege and thus the Agencies are justified in withholding that information.

### C.   Analyzing the Agencies' Deliberative Process Privilege Claims

We next turn to the Agencies' deliberative process privilege redactions, addressing only the redactions that are not separately protected by the attorney-client privilege.

### 1.   Legal Standards

The deliberative process privilege "shields from disclosure documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." U.S. Fish & Wildlife Serv. v. Sierra Club, Inc., 141 S. Ct. 777, __, 2021 WL 816352, at *4 (2021) (citation and internal quotation marks omitted).   The privilege is "rooted in the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news," id.

(citation and internal quotation marks omitted), is intended to promote "open and frank discussions" amongst government officials, Dep't of the Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8-9 (2001) (citations omitted), and is designed to provide a limited zone of privacy to foster reasoned decisions on policy and how to conduct government business, see ACLU, 925 F.3d at 592.

The privilege applies when the following two conditions are met.  First, the information must be "pre-decisional." ACLU, 925 F.3d at 592.  That is, the information was "prepared in order to assist an agency decisionmaker in arriving at his decision," id. (citation omitted), and "precedes, in temporal sequence, the decision to which it relates," Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 482 (2d Cir. 1999) (citation and internal quotation marks omitted).

Second, the information must be "deliberative," meaning that it "reflect[s] advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." Grand Cent. P'ship, 166 F.3d at 482 (citation and quotation marks omitted).  Factors animating this element include whether the information "(i) formed an essential link in a specified consultative process, (ii) reflect[s] the personal opinions of the writer rather than the policy of the agency, and (iii)

if released, would inaccurately reflect or prematurely disclose the views of the agency." Id. (citation and internal quotation marks omitted).

Excluded from the deliberative process privilege is information that is "purely factual," id. (citation omitted), unless the selective compilation of that factual material would itself reveal an aspect of an agency's deliberation, see Color of Change v. United States Dep't of Homeland Sec., 325 F. Supp. 3d 447, 455 (S.D.N.Y. 2018), or the factual information is "inextricably intertwined with policy making recommendations so that [its] disclosure would compromise the confidentiality of deliberative information that is entitled to protection under Exemption 5," Lead Indus. Ass'n v. Occupational Safety & Health Admin., 610 F.2d 70, 85 (2d Cir. 1979) (citation and internal quotation marks omitted).

Also not covered by the privilege are "discussions that take place after a decision has been made and rendered as the agency's effective law and policy," as contrasted with "communications received by the decisionmaker on the subject of the decision prior to the time the decision is made to ensure that the subsequent decision will be fully informed." ACLU, 925 F.3d at 593 (citations and internal quotation marks omitted).

Finally, even if an agency may lawfully withhold some portions of a record under the deliberative process privilege, the agency must disclose "[a]ny reasonably segregable portion of a record" that is not covered by the privilege, unless it is "inextricably intertwined with the exempt portions." 5 U.S.C. § 552(b); Knight First Amendment Inst. at Columbia Univ. v. U.S. Dep't of Homeland Sec., 407 F. Supp. 3d 334, 343 (S.D.N.Y. 2019) (citation and internal quotation marks omitted).

### 2. Withholding the July 25 RFF Memo Email Attachments

The ASPCA first challenges the Agencies' decision to withhold under the deliberative process privilege two attachments to the July 25 RFF Memo Email——notes from APHIS's inspection of Ruby Fur Farm and a draft memorandum regarding the same.[7] (Hensley Decl. Ex. 25.) The Agencies claim that releasing these attachments "would reveal pre-decisional communications among government personnel such as a

---

[7] The ASPCA only challenges the Agencies' withholding of the draft memorandum to the extent it contains purely factual material. While the cover email was addressed to members of the Office of General Counsel (see Hensley Decl. Ex. 24), the redactions on the face of the attachments reveal that the Agencies are not asserting that the attachments fall under the attorney-client privilege, only the deliberative process privilege (see id. Ex. 25). See 5 U.S.C. § 552(b) ("[T]he exemption under which the deletion is made[] shall be indicated on the released portion of the record . . . .").

discussion on the next steps in the [Ruby Fur Farm] matter."
(RFF Vaughn Index at 57.)

The vast majority of the information redacted from these attachments is not privileged, as it is purely factual material that does not reveal——even indirectly——how any agency action or policy was formed. While the "factual/deliberative divide is not always black and white[,] . . . the key question . . . [is] whether the disclosure of materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." Color of Change, 325 F. Supp. 3d at 455 (quoting Dudman Commc'ns Corp. v. Dep't of Air Force, 815 F.2d 1565, 1568 (D.C. Cir. 1987)) (internal quotation marks omitted).

Here, although the inspection notes simply recite the facts of the events involving Ruby Fur Farm to that point, the Agencies nevertheless assert that the notes should be withheld because the "choice of what factual material and prior final agency opinions to include or remove during the drafting process is itself often part of the deliberative process, and thus is properly exempt under Exemption 5." (Defs.' Mem. in Opp. at 18 (quoting ViroPharma Inc. v. HHS, 839 F. Supp. 2d 184, 193 (D.D.C. 2012)).)

The factual timeline of events contained in the notes does not appear to be a selectively curated presentation of the facts.   In that sense, these notes are easily distinguishable from the policy judgments presented in the draft intelligence assessments at issue in Color of Change, which were protected by the deliberative process privilege precisely because the they would reveal "the authors' judgment in cull[ing] the relevant documents, extract[ing] pertinent facts, [and] organiz[ing] them" to "support the positions [the authors] espoused."   325 F. Supp. 3d at 455-56 (citations and internal quotation marks omitted).   Rather, the notes here are more akin to "an investigative report prepared only to inform" agency personnel, which is not protected by the deliberative process privilege.   Adelante Alabama Worker Ctr. v. U.S. Dep't of Homeland Sec., 376 F. Supp. 3d 345, 363 (S.D.N.Y. 2019) (citation omitted).

Likewise, the majority of the draft memorandum, with the exception of the last two paragraphs, simply summarizes the background of APHIS investigation of Ruby Fur Farm.   The Agencies, however, contend that the factual portions of the draft memorandum should still be protected from disclosure because "any differences between the [earlier draft] memorandum, if potentially disclosed in redacted form, and [a] second memorandum would . . . reveal[] the evolution of

the draft."  (Defs.' Mem. in Opp. at 18 (quoting Shinnecock
Indian Nation v. Kempthorne, 652 F. Supp. 2d 345, 371
(E.D.N.Y. 2009)).)  That a document is labeled a draft is not
dispositive; the Court instead "must evaluate the documents
in the context of the administrative process which generated
them." Sierra Club, 141 S. Ct. at __, 2021 WL 816352, at *5
(citation and internal quotation marks omitted).

Here, unlike in Sierra Club where the drafts were
protected because they contained "opinions that were subject
to change," id., the document at issue mostly summarizes the
facts of the Agencies' Ruby Fur Farm actions, which is not
material that would be revised as the Agencies' deliberations
developed.  Furthermore, as with the notes discussed above,
nothing about the memorandum suggests that it reflects the
author's considered judgment in selectively presenting the
facts.  Cf. Color of Change, 325 F. Supp. 3d at 455-56.  In
other words, the factual portions of the draft memorandum
would not expose any aspect of the Agencies' thought process
in reaching a decision on how to proceed with respect to Ruby
Fur Farm.

Moreover, the Agencies' submissions do not assert that
there actually were any changes to the draft that would
disclose the Agencies' deliberative process.  Indeed, the
Court's in camera comparison of this draft memorandum with

another document from an email the next day that no longer identified the memorandum as a "draft" confirmed that the two versions are identical.   (Hensley Decl. Exs. 24, 25.) Accordingly, there was no "evolution" of the draft that would be protected by the deliberative process privilege and thus there is nothing about the purely factual portions of this draft memorandum that would be "inextricably intertwined with" or otherwise reveal "the agency's deliberative process." Grand Cent. P'ship, 166 F.3d at 482 (citation omitted).

On the other hand, the last two paragraphs of the draft memorandum (with the exception of the first two sentences of the penultimate paragraph) outline the potential steps that the Agencies may take with respect to Ruby Fur Farm if certain events should come to pass.  Unlike the purely factual matter analyzed above, this discussion about how the Agencies might respond in various scenarios would reveal the Agencies' interim thoughts on courses of action that are contingent and subject to change.  See Sierra Club, 141 S. Ct. at __, 2021 WL 816352, at *5.  This information is an illustrative example of the what the deliberative process privilege intends to protect, and it was therefore properly withheld by the Agencies.

### 3.   RFF Email Update Chain Redactions

The ASPCA next contends that the Agencies improperly redacted information from two emails in the RFF Email Update Chain——one sent from APHIS Administrator Kevin Shea on July 25 explaining how the Agencies decided to proceed with the Ruby Fur Farm situation and one sent in reply from Mr. Clovis on July 26 merely expressing his support for that decision.[8] (Hensley Decl. Ex. 22.)

The Agencies claim that both of these emails are privileged because they discuss "what course of action to take regarding inspecting [Ruby Fur Farm]," which would "reveal pre-decisional . . . discussions regarding APHIS's plan concerning [Ruby Fur Farm]" and "jeopardize the candid and comprehensive considerations essential for efficient and effective agency decision-making."  (RFF Vaughn Index at 6.)

While that argument is persuasive for the July 25 email from Mr. Shea, which describes how the Agencies weighed various factors to arrive at a decision about how to proceed with the Ruby Fur Farm situation, the same cannot be said of the July 26 email from Mr. Clovis, which merely expresses his agreement with the plan the Agencies had already decided upon.

---

[8]    As discussed above, the July 25 email in that chain from Ms. Juarez is protected from disclosure under the attorney-client privilege.  The Agencies do not invoke that privilege for the emails from Messrs. Shea or Clovis.

Therefore, Mr. Shea's email falls under the deliberative process privilege and Mr. Clovis's email does not.

### 4.   July 26 RFF Email to Staff Redactions

The ASPCA next challenges the Agencies' redactions of portions of the July 26 RFF Email that Ms. Juarez sent to her staff summarizing the Agencies' ultimate decision on Ruby Fur Farm and a memorandum attached to that email.[9]  (Hensley Decl. Ex. 21.)

Here, the Agencies argue that the redacted portions of the cover email "would reveal pre-decisional . . . discussions regarding the agencies['] plan to address allegations on non-compliances at [Ruby Fur Farm]" and that the memorandum does "not accurately reflect the agencies['] final decision."  (RFF Vaughn Index at 4-5.)

The Agencies, however, concede that they had already decided by July 26 to constructively rescind the Ruby Fur Farm confiscation notice.  (SOMF ¶ 64.)  In other words, the final decision on the appropriate course of action had already been made.  The portions of the email at issue (i.e., the third and fourth paragraphs, which are not attorney-client privileged) do not reveal how the Agencies arrived at that

---

[9]     The ASPCA does not challenge the Agencies' decision to withhold a draft administrative complaint attached to the email. Additionally, as analyzed above, the first two paragraphs of the cover email are protected from disclosure by the attorney-client privilege.

determination.  Rather, they simply state that Ms. Juarez was attaching a memorandum describing what happened with the Ruby Fur Farm inspection and relay Ms. Juarez's encouragement to staff to continue their hard work towards the Agencies' enforcement goals going forward.  The first statement is self-evidently not protected by the deliberative process privilege.  Nor does the privilege protect Ms. Juarez's words of encouragement, which do not reveal any the details of any deliberations that "precede[], in temporal sequence, the 'decision' to which it relates," and are thus not covered by the privilege.  Grand Cent. P'ship, 166 F.3d at 482 (citation omitted).

The memorandum attached to the email is virtually identical to the "draft" version discussed above, except that the file name no longer identifies it as a draft.  Thus, it largely consists of non-protected purely factual material. Only the last two paragraphs (with the exception of the first two sentences of the penultimate paragraph) of the memorandum fall under the protections of the deliberative process privilege.

### 5.   Cavalry Group Email Chain Redactions

The last deliberative process privilege redactions that the ASPCA disputes are contained in a July 27 email sent by Ms. Juarez to Associate APHIS Administrator Dr. Jere Dick and

Mr. Shea as part of the Cavalry Group Email Chain.[10]   (Hensley
Decl. Ex. 23.)

The Agencies claim that the Cavalry Group Email Chain is
protected by the deliberative process privilege because it
contains "discussions between APHIS employees concerning the
confiscation, including the next steps involving inspection
of the [Ruby Fur Farm] facility" and thus "would reveal pre-
decisional communications among government personnel such as
discussions regarding APHIS's plan concerning [Ruby Fur
Farm]."  (RFF Vaughn Index at 9.)

While this is true of the unchallenged redactions of the
July 24 emails, that is not the case for the July 27 email at
issue.  This email post-dates APHIS's effective rescission of
its confiscation order on July 26 and does not reflect any
pre-decisional deliberative discussions about how the
Agencies weighed various factors in arriving at their plan
for handling the Ruby Fur Farm situation.  Accordingly, the
deliberative process privilege does not apply.  See Grand
Cent. P'ship, 166 F.3d at 482.

### 6.  Foreseeable Harm

As with the attorney-client privilege, the Court must
independently determine whether the Agencies have established

---

[10]   The ASPCA is not challenging the Agencies' redactions to the
July 24 emails on the same chain.

that disclosure of the privileged information "would harm an interest protected by [the] exemption."   5 U.S.C. § 552(a)(8)(A).

As discussed above, the purpose of the deliberative process privilege is to afford government employees a protected space to weigh various factors, consider policy implications, and contemplate alternative courses of action before implementing a final policy decision. See Sierra Club, 141 S. Ct. at __, 2021 WL 816352, at *5; Grand Cent. P'ship, 166 F.3d at 481.

Here, the Court is satisfied based on the Agencies' submissions that the limited material that falls into the deliberative process privilege, if revealed, would harm these interests.   Those interests are particularly acute in the context of the Ruby Fur Farm episode because, as the record demonstrates, these deliberations concerned a sensitive and evolving situation involving the threat of litigation over the Agencies' actions.   Based on these facts, the Court concludes that "disclosure would harm an interest protected by [the] exemption," 5 U.S.C. § 552(a)(8)(A), and therefore the Agencies properly withheld the limited information that falls under the deliberative process privilege.

### III.  **The ASCPA's Policy and Practice Claim**

The Agencies move for judgment on the pleadings under Fed. R. Civ. P. 12(c) for the ASPCA's policy and practice claim.  As discussed above, in analyzing the Agencies' motion, the Court must determine whether, accepting all factual allegations as true and resolving all reasonable inferences in the light most favorable to the ASPCA, the Amended Complaint states a claim upon which relief can be granted.

The ASPCA's policy and practice claim rests on three principal bases, namely that the Agencies: (1) did not promptly make FOIA records available to the ASPCA; (2) failed to respond to several of the ASPCA's FOIA requests within 20 business days; and (iii) unlawfully invoked FOIA exemptions to withhold information that the Agencies published on its databases before February 2017.  (See Am. Compl. ¶¶ 379-80.) The ASPCA further alleges that, as a frequent submitter of FOIA requests to the Agencies, it has been, and will continue to be, harmed by these practices.  (See id. ¶¶ 49, 381.)  The ASPCA prays for declaratory and injunctive relief related to its policy and practice claim.  (Id. at 72.)

### A.    **Justiciability of Policy and Practice Claims**

As a threshold issue, the Agencies cast doubt on whether FOIA policy and practice claims are cognizable in the Second Circuit.

While it is true that the Second Circuit has "not yet recognized or articulated the inquiry relevant to a pattern or practice claim in the FOIA context," the court has noted that "[o]ther circuits and district courts have . . . concluded that a plaintiff may bring an independent claim alleging a pattern or practice of violating the FOIA." Pietrangelo v. U.S. Army, 334 F. App'x 358, 360 (2d Cir. 2009) (summary order) (upholding district court's grant of summary judgment to agency on pattern and practice claim).

As thoroughly analyzed by the D.C. Circuit, there is nothing in the FOIA that prevents a federal court from granting equitable relief to address an agency's "policy or practice" that "will impair the [requester's] lawful access to information in the future." Payne Enterprises, Inc. v. United States, 837 F.2d 486, 491, 494 (D.C. Cir. 1988) (The "FOIA imposes no limits on courts' equitable powers in enforcing its terms.") (citations and emphases omitted); see Judicial Watch, Inc. v. United States Dep't of Homeland Sec., 895 F.3d 770, 777 (D.C. Cir. 2018) (noting that the FOIA authorizes courts to "enjoin the agency from withholding agency records" and that this "injunctive authority does not limit the district court's inherent injunctive powers") (citations omitted).

Consistent with this view of federal courts' equitable authority under the FOIA, other courts in this Circuit have proceeded to adjudicate policy and practice claims, although the Court is not aware of any case in this Circuit in which a plaintiff has been granted relief on such a claim.  See, e.g., Doyle v. U.S. Dep't of Homeland Sec., 331 F. Supp. 3d 27, 66 (S.D.N.Y. 2018), aff'd sub nom. Doyle v. United States Dep't of Homeland Sec., 959 F.3d 72 (2d Cir. 2020); Panjiva, Inc. v. United States Customs & Border Prot., 342 F. Supp. 3d 481, 496 (S.D.N.Y. 2018), aff'd, 975 F.3d 171 (2d Cir. 2020); N.Y. Times Co. v. F.B.I., 822 F. Supp. 2d 426, 431 (S.D.N.Y. 2011).  This Court agrees with the D.C. Circuit's analysis and joins the other district courts in this Circuit in recognizing that FOIA policy and practice claims are justiciable.

**B.   Legal Standards for a Policy and Practice Claim**

Acknowledging that the Second Circuit has not delineated any legal standards for evaluating policy and practice claims, the parties brief this issue according to the legal framework established by the D.C. Circuit.  Accordingly, for this Opinion, the Court applies the same framework.

As articulated by the D.C. Circuit, policy and practice claims are viable when a plaintiff establishes that "an agency's refusal to supply information evidences a policy or

practice of delayed disclosure or some other failure to abide by the terms of the FOIA" as opposed to "mere[] isolated mistakes by agency officials."  <u>Payne</u>, 837 F.2d at 491.

These policies and practices need not be formal, and thus a complaint can survive dismissal by alleging that an agency adopted an informal policy or practice of violating the FOIA.  <u>Judicial Watch</u>, 895 F.3d at 778–79 (citations omitted).  For example, plaintiffs may state a claim by alleging that "repeated, unexplained, and prolonged delay[s] in making information available" or "regular[] fail[ures] to issue determinations in response to [plaintiff's] . . . FOIA requests within the time period required by [the] FOIA" has resulted in an agency's "persistent failure to adhere to [the] FOIA's requirements" and "will interfere with [plaintiff's] right under FOIA to promptly obtain non-exempt records from the agency in the future."  <u>Id.</u> at 777-780 (citations, internal quotation marks, and emphases omitted).  Likewise, a policy and practice claim may rest on allegations that an agency is routinely withholding non-exempt information from disclosure in bad faith.  <u>See</u> <u>Payne</u>, 837 F.2d at 487–91.

Government agencies also cannot moot a policy and practice claim by simply producing the information that plaintiff requested.  <u>See</u> <u>Judicial Watch</u>, 895 F.3d at 777. Rather, a claim remains justiciable so long as a plaintiff

can show that the agency's practice "will impair the party's lawful access to information in the future," id. (citation omitted), and that the plaintiff "will suffer continuing injury due to this practice," Payne, 837 F.2d at 490-91 (citation and internal quotation marks omitted).

## C.   Application to the ASPCA's Allegations

As the allegations in the Amended Complaint demonstrate and as acknowledged in the ASPCA's briefing for the judgment on the pleadings motion, the issues underlying the ASPCA's policy and practice claim became acute following February 3, 2017.[11]   That is the date when the Agencies decided to decommission the public databases that hosted their most frequently requested categories of records and instead instructed members of the public to submit FOIA requests for those records.   (Am. Compl. ¶¶ 41, 46-47.)   As the Amended Complaint alleges, this decision led to a predictable deluge of FOIA requests and caused the Agencies to frequently miss the FOIA's response and production requirements, including

_____

[11]   (See Am. Compl. ¶¶ 35-37, 41-43, 45-49; compare id. ¶¶ 50-54 (detailing the Agencies' FOIA noncompliance with five requests submitted in the year leading up to February 2017), with id. ¶¶ 55-85 (detailing the Agencies' noncompliance with 30 requests in the roughly two-year period between February 2017 and April 2019); see also ASPCA Mem. in Opp. (ECF No. 50) at 7 ("[T]he Agencies' disregard for their obligations under the FOIA became acute in 2017.").)   And, while the ASPCA alleges that the Agencies were tardy in responding to five FOIA requests submitted by the ASPCA in 2016 (Am. Compl. ¶¶ 50-54), such allegations do not plausibly establish that the Agencies adopted some policy or practice that led to a systemic or persistent failure to comply with the FOIA before February 3, 2017.

for dozens of requests submitted by the ASPCA.  (Id. ¶¶ 41,
46-49.)  Moreover, after February 3, 2017, the Agencies began
redacting certain information that could be used to link
licensees to AWA inspections and enforcement actions, which
information the Agencies had previously published on the
databases.  (Id. ¶ 45.)

The Court agrees that these allegations plausibly
demonstrate that the Agencies made a decision on February 3,
2017 that led to a self-inflicted breakdown in their ability
to timely process FOIA requests and promptly produce
responsive records.  In decommissioning public databases of
their most frequently requested records, the Agencies
deliberately reversed measures designed to alleviate their
FOIA burdens without having in place an adequate plan to
address the eminently foreseeable increase in FOIA requests.
The FOIA, of course, affords no exception for ill-advised
policy choices that leave agencies unprepared to fulfill
their statutory duty to timely respond to FOIA requests.

Likewise, the ASPCA also plausibly alleges the Agencies
acted unlawfully by invoking FOIA exemptions after February
3, 2017 to conceal information in records that the Agencies
previously chose to publish on the databases.  See Davis v.
U.S. Dep't of Justice, 968 F.2d 1276, 1279-80 (D.C. Cir. 1992)
("[T]he government cannot rely on an otherwise valid

exemption claim to justify withholding information that has been officially acknowledged or is in the public domain.") (citations and internal quotation marks omitted).

However, the Amended Complaint does not relate the entire story.  Since the ASPCA filed its lawsuit challenging the Agencies' policies and practices, Congress intervened to reverse the actions taken on February 3, 2017 by enacting Section 788 of the Further Consolidated Appropriations Act of 2020, 7 U.S.C. § 2146a ("Appropriations Act").[12]

Under Section 788, the Agencies are required to "restore on [their] website the searchable database and its contents that were available on January 30, 2017, and all content generated since that date."  Id. § 2146a(a).  The Act further mandates that the Agencies make available the following categories of records "in their entirety without redactions except signatures":

> (1) all final Animal Welfare Act inspection reports, including all reports documenting all Animal Welfare Act non-compliances observed by USDA officials and all animal inventories;
>
> (2) all final Animal Welfare Act and Horse Protection Act enforcement records;

---

[12]   The Court may take judicial notice of Congress's enactment of the Appropriations Act in deciding the whether the ASPCA has stated a viable policy and practice claim.  See Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 75 (2d Cir. 1998).

> (3) all reports or other materials documenting any non-compliances observed by USDA officials; and
>
> (4) within six months of receipt by the agency, all final Animal Welfare Act research facility annual reports, including their attachments with appropriate redactions made for confidential business information that USDA could withhold under FOIA Exemption 4.

Id. § 2146a(b).  Notably, these categories of disclosures substantially overlap with the information the Agencies withheld from documents after February 3, 2017, such as identifying information on inspection reports and enforcement records that the Agencies began redacting after taking down the databases.

Because Congress already acted to address the Agencies' policies and practices adopted on February 3, 2017 that underlie the ASPCA's claims,[13] the ASPCA has not established that the Court must intervene to correct a policy or practice that the Agencies have in place that "will impair the

---

[13]    The ASPCA submits that the Appropriations Act and the Agencies' restoration of the databases do not fully moot its policy and practice claim because the databases do not make available photographs taken during licensee inspections, which are records that the ASPCA frequently requests.  The Amended Complaint, however, does not plausibly support that the Agencies implemented some special policy or practice of withholding photographs from FOIA productions.  Instead, as detailed above, the offending policy and practice described in the Amended Complaint was the systemic collapse of the Agencies' FOIA processes following their decision to shut down the databases in February 2017.

[ASPCA's] lawful access to information in the future."[14] *Payne*, 837 F.2d at 487-91.  Accordingly, the ASPCA does not state a valid policy and practice claim upon which relief can be granted.[15]

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the Agencies' motion for summary judgment, grants in part and denies in part the ASPCA's motion for summary judgment, and grants the Agencies motion for judgment on the pleadings.  The Court denies as moot the parties' cross-motions for summary judgment on the ASPCA's policy and practice claim.

The parties are directed to confer and submit a proposed order consistent with this Opinion within 21 days.  The Clerk

---

[14]   The ASPCA argues that their claim should survive dismissal because the Agencies do not "satisfy[] the heavy burden of demonstrating that there is no reasonable expectation . . . that the alleged violation will recur" after their "voluntary cessation" of the alleged unlawful policy or practice.  *Payne*, 837 F.2d at 491-92.  Here, of course, the cessation of the challenged policy and practice was anything but voluntary.  It was, instead, compelled by an act of Congress.  As the Agencies are duty bound to follow the law, there is no "reasonable expectation" that they will re-adopt the policies from February 3, 2017 that Congress has now strictly forbidden.

[15]   In the alternative, had the Court broken new ground in the Circuit and found that the ASPCA successfully stated a policy and practice claim, the Court would grant the Agencies' motion for summary judgment on the issue for substantially the same reasons: because Congress has already acted to address the challenged policies and practices, the record does not convince the Court that the equitable relief the ASPCA seeks is warranted.

of Court is respectfully directed to terminate the motions currently pending at ECF Nos. 42 and 49.

      **SO ORDERED.**

Dated:     New York, New York
             March 25, 2021

                                 NAOMI REICE BUCHWALD
                            UNITED STATES DISTRICT JUDGE